Michael J. STOKES, et al., Plaintiffs,

v.

NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES, et al., Defendants.

Edward ROBINSON, et al., Plaintiffs,

v.

NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES, et al., Defendants.

Nos. 80 Civ. 1364–CLB, 81 Civ. 0414–CLB.

United States District Court, S.D. New York.

Sept. 27, 1982.

---

Lawrence S. Cumberbatch, New York City, for plaintiffs.

Robert Abrams, Atty. Gen. of State of N.Y. by Judith Kramer, Asst. Atty. Gen., New York City, for defendants.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

Familiarity of the reader with this Court's Memorandum Decision docketed June 29, 1981 in the first above entitled *Stokes* action is assumed. In the interests of brevity, the procedural history of this litigation set forth therein will not be repeated. As a result of that decision there was left for trial in the *Stokes* case claims of racial discrimination made by the remaining plaintiffs in *Stokes* and plaintiffs in *Robinson,* namely, Green, Wells, Robinson, Whitney and Patterson ("the supervisory employees"); Wedderburn and Casiano ("the non-supervisory employees"). The claims are founded solely on alleged violation of Title 42 U.S.C. § 1981 and the Fourteenth Amendment. The Title VII claims asserted under 42 U.S.C. § 2000e, *et seq.* have been dismissed without prejudice as a result of this Court's June 29, 1981 decision.

The second above entitled action, *Robinson,* was filed as a related case to *Stokes,* and treated as such by the Court. The same attorneys appearing in *Stokes* represent the parties in *Robinson,* and the defendants are the same. The theory of assigning a "related" case to the same Judge to whom the prior (lower) docket numbered case has been assigned, is that all pre-trial proceedings may be supervised together, and the cases may be tried together so as to assure consistency of result and to save time and expense for the parties, the attorneys and the Court. Ordinarily in attending to a related case a joint trial is preferable to a formal order of consolidation, because once a case is consolidated a severance or the necessary finding under Rule 54(b), F.R.Civ.P. would be necessary before a judgment could be entered as to less than all of the parties.

The *Stokes* case was brought to trial before me on February 8, 9 and 10, 1982, and decision was reserved pending the submission of post-trial memoranda. Through some inadvertence, the Docket and Courtroom minutes do not show that the *Robinson* case was actually brought to trial at the same time as the *Stokes* case. However, at the opening of trial, the attorney for plaintiffs in both actions produced Mr. Alvin Whitney, a co-plaintiff in *Robinson* as his first witness. Mr. Whitney was not a party to the *Stokes* case, and his name was not listed on the witness list required as a part of the pre-trial procedures for trial of the *Stokes* case. Defendants objected to taking the testimony of Mr. Whitney on that ground. At that point the attorney for plaintiffs informed the Court that he was going to "add three persons [as witnesses] who are parties to this other [*Robinson*] action." (Tr. p. 5). The Court thereafter overruled the objection and accepted the testimony of Mr. Whitney, as well as the testimony of Mr. Lafayette W. Patterson. Mr. Robinson did not testify, but it was stipulated that his testimony would be substantially the same as that of Whitney and Patterson. At a hearing held September 20, 1982 the Court held that the trial of

*Stokes* should be considered for all purposes as a joint trial of the *Robinson* case. Counsel agreed that this was appropriate.

Plaintiffs are black persons, except for Casiano, who is Hispanic. The remaining defendants before the Court are Thomas A. Coughlin, who at relevant times was the Commissioner of the New York State Department of Correctional Services ("DOCS"), Victor S. Bahou, who was President and Commissioner of the New York State Civil Service Commission ("CSC"), James T. McFarland and Josephine L. Gambino, who were Commissioners of the CSC.

As noted in our prior decision in *Stokes*, plaintiffs claimed that in implementing the New York Civil Service Law, § 81, the defendants have discriminated against them and a number of others similarly situated, on the basis of race, color or national origin in violation of 42 U.S.C. § 1981 and § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

Plaintiffs in these cases were all employed by the New York State Office of Drug Abuse Services ("ODAS"), a bureaucracy which had previously been known as the Drug Abuse Control Commission ("DACC") and prior to that as the Narcotics Addiction Control Commission ("NACC"). The non-supervisory employees had served as Narcotics Correction Officers ("NCOs"), while the supervisory plaintiffs were Narcotic Correction Charge Officers ("NCCO"), or Chief Narcotic Correction Charge Officers ("NChCCO").

A statewide custodial narcotics program had been started by New York State in the nineteen sixties. From its inception the program grew rapidly, phasing in facilities for the custodial treatment of narcotics addicts in various places, mostly in the so-called "downstate area." These institutions varied as to the size of population and the extent of custody and supervision imposed upon the addict inmates. However, in reality, the more secure narcotics facilities were essentially equivalent to the least secure prisons (correctional facilities) in the State, operated by DOCS. The majority of the supervisory employees at ODAS facilities were White. However, compared to those holding similar positions at DOCS, there was a much larger minority representation within the ODAS work force. Also, the minority representation was considerably greater at the non-supervisory level in ODAS than at DOCS. This situation arose for a number of reasons, including an effective affirmative action program conducted by those in charge of ODAS, as well as the fact that the facilities were located generally in downstate areas of the State which tend to have a more substantial Black and Hispanic population. Also, ODAS was manned later in time than similar DOCS facilities.

In 1971, due to secular changes, beyond the scope of this opinion and not relevant, the New York State drug program began a substantial retrenchment. First, it closed some of its upstate facilities. Thereafter other facilities were closed. Plaintiffs and those similarly situated were laid off, or in the language of government, they were "riffed" (the acronym for "Reduction in Force").

Pursuant to New York Civil Service Law § 81, an employee who is riffed has the right to be placed on a preferred list for the position held at the time he was laid off. Section 81 provides in relevant part that:

"1. Establishment of preferred lists; general provisions. The head of any department, office or institution in which an employee is suspended or demoted in accordance with the provisions of sections eighty and eighty-a of this chapter shall, upon such suspension or demotion, furnish a state civil service department or appropriate municipal commission, as the case may be, a statement showing his name, title or position, date of appointment, and the date of and reason for suspension or demotion. It shall be the duty of such civil service department or commission, as the case may be, forthwith to place the name of such employee upon a preferred list, together with others who may have been suspended or demoted for the same or similar positions in the same

jurisdictional class, and to certify such list, as hereinafter provided, for filling vacancies in the same jurisdictional class; first, in the same or similar position; second, in any position in a lower grade in line of promotion; and third, in any comparable position. Such preferred list shall be certified for filling a vacancy in any such position before certification is made from any other list, including a promotion eligible list, notwithstanding the fact that none of the persons on such preferred list was suspended from or demoted in the department or suspension and demotion unit in which such vacancy exists. No other name shall be certified from any other list for any such position until such preferred list is exhausted. The eligibility for reinstatement of a person whose name appears on any such preferred list shall not continue for a period longer than four years from the date of separation or demotion.

2. Order of certification of names from preferred lists. Except as hereinafter provided, the names of persons on a preferred list shall be certified therefrom for reinstatement to a vacancy in an appropriate position in the order of their original appointments.

(a) Upon the occurrence of a vacancy in an appropriate position in the service of a civil division, except in a city having a population of one million or more, the names of persons on the preferred list shall be certified to fill such vacancy in the following order: (1) persons suspended from or demoted in the department or agency within which such vacancy occurs; and (2) persons suspended from or demoted in other departments and agencies in such civil division.

(b) Upon the occurrence of a vacancy in an appropriate position in the state service, or in the service of a city having a population of one million or more, the names of persons on the preferred list shall be certified to fill such vacancy in the following order: (1) persons suspended from or demoted in the department in which such vacancy exists, except that where such vacancy exists in a separate suspension and demotion unit, the names of persons suspended from or demoted in such unit, and not those suspended from or demoted in the entire department, shall be certified first; and (2) all other persons on such preferred list."

Trial was held before me without a jury on February 8, 9 and 10, 1982. The post-trial submissions of counsel were received in March, 1982.

Following trial, on June 29, 1982, the Supreme Court decided *General Building Contractors Association, Inc. v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835. That decision altered or clarified the significant issue in these cases.

As will be seen from the facts stated below, it is clear that defendants' activities which are complained of resulted in a "disproportionate impact" on a particular class, that is, former custodial employees of ODAS, and that the class consisted of substantially more Blacks and other minorities than comprised the class of equivalent DOCS employees which was the indirect beneficiary of the impact.

Plaintiffs made a good showing on the trial record that the treatment visited upon the supervisory plaintiffs was unfair and unreasonable, although it is possible to argue otherwise. What plaintiffs did not prove, however, was that the conduct was motivated by a discriminatory purpose, *i.e.,* a purpose to discriminate on the ground of race or national origin.

In finding that the Civil Rights Law of 1866, now codified as 42 U.S.C. § 1981, *et seq.,* required proof of a specific discriminatory purpose and intent, the Supreme Court held in *General Building Contractors* in relevant part as follows:

"The immediate evils with which the Thirty-ninth Congress was concerned simply did not include practices that were 'neutral on their face, and even neutral in terms of intent,' *Griggs v. Duke Power Co.,* 401 U.S. 424, 430 [91 S.Ct. 849, 853, 28 L.Ed.2d 158] (1971), but that had the incidental effect of disadvantaging blacks to a greater degree than whites. Con-

gress instead acted to protect the freedmen from intentional discrimination by those whose object was 'to make their former slaves dependent serfs, victims of unjust laws, and debarred from all progress and elevation by organized social prejudices.' Cong.Globe, 39th Cong., 1st Sess. 1839 (1866) (Rep. Clarke). See *Memphis v. Greene,* 451 U.S. 100, 131–135 [101 S.Ct. 1584, 1602–1604, 67 L.Ed.2d 769] (1981) (White, J., concurring in the judgment). The supporters of the bill repeatedly emphasized that the legislation was designed to eradicate blatant deprivations of civil rights, clearly fashioned with the purpose of oppressing the former slaves. To infer that Congress sought to accomplish more than this would require stronger evidence in the legislative record than we have been able to discern. [Footnote omitted].

"Our conclusion that § 1981 reaches only purposeful discrimination is supported by one final observation about its legislative history. As noted earlier, the origins of the law can be traced to both the Civil Rights Act of 1866 and the Enforcement Act of 1870. Both of these laws, in turn, were legislative cousins of the Fourteenth Amendment. The 1866 Act represented Congress' first attempt to ensure equal rights for the freedmen following the formal abolition of slavery effected by the Thirteenth Amendment. As such, it constituted an initial blueprint of the Fourteenth Amendment, which Congress proposed in part as a means of 'incorporat[ing] the guaranties of the Civil Rights Act of 1866 in the organic law of the land.' *Hurd v. Hodge,* 334 U.S. [24] at 32 [68 S.Ct. 847 at 851, 92 L.Ed. 1187]. [Footnote omitted]. The 1870 Act, which contained the language that now appears in § 1981, was enacted as a means of enforcing the recently ratified Fourteenth Amendment. In light of the close connection between these Acts and the Amendment, it would be incongruous to construe the principal object of their successor, § 1981, in a manner markedly different from that of the Amendment itself." [Footnote omitted]. 458 U.S. at 388, 102 S.Ct. at 3149.

*General Building Contractors* also disposes of so much of the remaining plaintiffs' claims as is founded on the Fourteenth Amendment itself. The Court held:

" '[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact.' *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 264–265 [97 S.Ct. 555, 562–563, 50 L.Ed.2d 450] (1977). '[E]ven if a neutral law has a disproportionately adverse impact upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose.' *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 272 [99 S.Ct. 2282, 60 L.Ed.2d 870] (1979). See *Washington v. Davis,* 426 U.S. 229 [96 S.Ct. 2040, 48 L.Ed.2d 597] (1976)."

The proof at trial showed that with respect to a large number of employees situated as were these plaintiffs, the State followed a uniform policy with significant exceptions noted below.

Specifically, Rosalie Green had worked at the Manhattan Treatment Center as an NCO, and later as an NCCO. She was laid off in 1977, and placed upon a preferred list which was certified for the job of Safety Officer, pay grade 9, as well as the job of Corrections Officer (in DOCS), pay grade 16. She is currently employed, since 1978, as a Safety Officer at Kingsborough Psychiatric Center. Plaintiff Green is still on a preferred list for Corrections Officer. She claims, for reasons set forth below, that she should have been given preferred status as a Correctional Sergeant and that the defendants intentionally and purposefully discriminated against her on account of her race by refusing in their administration of § 81 of the New York State Civil Service Law to give her preferred list status as a Correctional Sergeant for employment by DOCS.

Plaintiff Gerald Wells served as a NChCCO until 1977, with prior service as a Narcotics Corrections Supervising Officer.

Following his termination by ODAS he became a Corrections Officer in DOCS, promoted to a Lieutenant in DOCS on January 13, 1982. Plaintiff Wells claims that the defendants discriminated against him on account of race by refusing to give him preferred list status for reinstatement as a Captain for employment by DOCS. The *Robinson* plaintiffs had served as Narcotics Correction Charge Officers equivalent to a grade of Sergeant in the Department of Correctional Services, except that they were employed at the Arthur Kill Facility. The transition of that facility into the DOCS system of correctional facilities is described in detail below.

Wedderburn and Casiano, the non-supervisory employees, state a slightly different claim. Wedderburn was an NCO laid off on June 27, 1976. The facility in Manhattan at which he was employed was closed, and he was placed on a preferred list qualifying him for employment as a Safety Officer in the Department of Mental Hygiene, where he is currently employed, as well as being certified as a Corrections Officer *for* employment in DOCS. He claims that the defendants discriminated against him on account of race by refusing to give him preferred list status in filling vacancies in the job of Correction Officer in *downstate facilities* of DOCS. The question of assignment in downstate facilities, as opposed to upstate facilities, is discussed below. Plaintiff Casiano was an NCO until June, 1977, when he was laid off. He informed the CSC that he would only accept employment as a Correction Officer with DOCS in a downstate facility. He claims that the defendants discriminated against him on account of his national origin (Hispanic) by refusing to give him preference in filling vacancies in the job of Correction Officer in downstate facilities of DOCS.

A number of ODAS employees whose employment was terminated were the subject of Civil Service Commission rulings, similar to those visited upon the supervisory employee plaintiffs here. CSC considered the issue of whether the supervisory positions held by the persons riffed at ODAS facilities were comparable to similarly paid supervisory positions in the Correctional Service so as to entitle them to certification on a preferred list for reinstatement to equivalent pay grade supervisory jobs in DOCS as openings occurred. The DOCS took the position that ODAS supervisory job titles were not comparable to DOCS titles in the same pay grades. CSC originally ruled otherwise, then changed its position and agreed with DOCS.

These were decisions which could reasonably be characterized as unfair because of the following: At the same time that this reclassification was going on, and immediately prior thereto, DOCS had taken control from ODAS of the so-called "Arthur Kill Facility" on Staten Island and three other facilities. On the day of the transfer, all ODAS supervisors and charge officers assigned to Arthur Kill were informed that they would become (provisional) Lieutenants and Sergeants, respectively in DOCS. DOCS took over the Arthur Kill Facility from ODAS, substituted convicts in custody in place of addicts, and except for adding shotguns to the towers, the physical layout of the facility remained unchanged. The entire operating personnel of ODAS at Arthur Kill remained in place as DOCS employees, with little change. Of course they were now required to wear Correctional Officers' uniforms. The security measures and institutional operations were not materially different and required no significant difference in skills. A similar procedure was followed at three other smaller ODAS institutions. The Arthur Kill institution continued to operate successfully, now as a Correctional Facility, and, apparently, so did the other transferred institutions staffed essentially by the same people who had been operating it as an ODAS facility before it became a prison. These employees received little significant additional training or education from DOCS; instruction in the use of firearms and a manual on the rights of inmates. No Narcotics Charge Officer who had been transferred laterally to be a Corrections Sergeant after DOCS assumed the management of the Arthur Kill Facility was terminated on the ground

of claimed inability to perform the work. All functioned successfully. We are therefore faced with the rather bizarre situation where a reduction of force took place, and those supervisory employees of ODAS who just happened to be working at Arthur Kill and three similar transferred institutions, shifted laterally with ease into equivalent supervisory positions with DOCS, while those supervisory ODAS employees who were working at ODAS facilities which were closed and *not* transferred lock, stock and barrel to DOCS for use as prisons, were regarded by CSC and DOCS as not qualified for certification for the preferred list for reinstatement to supervisory positions at equivalent pay at DOCS facilities. The successful operation of Arthur Kill showed that the jobs were essentially comparable, and all of the proof at trial showed that the differences between the custodial·supervision work performed at ODAS institutions and those performed at most DOCS institutions (those of moderate security) were so trivial that a lateral transfer was entirely feasible.

The possibility of certifying riffed ODAS supervisory workers to a preferred list for reinstatement in supervisory positions of comparable pay and responsibility in DOCS presented serious political and administrative problems for DOCS and CSC. No difficulty was experienced with the non-supervisory people, such as plaintiffs Wedderburn and Casiano. Defendants agreed that these persons were qualified for employment as corrections officers, and their grievance relates only to the question of the place of their employment, discussed below. While this momentous decision was being made, theoretically not by DOCS but by CSC with whatever input and recommendations from DOCS it cared to consider, Council 82, the collective bargaining agent for ODAS security staff *and* for DOCS security staff, took the position that while many ODAS titles were comparable to equivalent pay DOCS titles, the supervisory titles were not.

Had CSC adhered to its earlier ruling the result would be that all ODAS supervisory personnel who had been riffed and who chose to take supervisory employment with DOCS would as a matter of right be chosen to fill supervisory vacancies in DOCS before *any* non-supervisory or lower level supervisory employees in DOCS eligible for promotion could be promoted. This, defendants concluded, would cause a serious morale problem with the existing staff of DOCS. A wait of ten years for a correction officer to be appointed as a sergeant, and four or five years to go from sergeant to lieutenant, and an equal period of time from lieutenant to captain was then not unusual in the hierarchy of DOCS. However, many of the supervisory persons in ODAS seeking lateral transfer had served much less time in the system. This was so essentially because ODAS was a newer branch of government, which had recruited persons into supervisory jobs directly from the civilian job market and had promoted rapidly. It was obvious to defendants that the expectations of DOCS' current staff to receive promotion would be destroyed during whatever length of time it took for DOCS' routinely occurring vacancies to absorb the large number of unemployed ODAS supervisory officers. During its heyday ODAS officers had been promoted so freely that they often spent the minimum time in grade before reaching the next job slot. For example, if the supervisory titles had been deemed comparable, as this Court believes they probably should have been, plaintiff Wells would have become a Captain after having been employed for less than a total of three years in all of his civil service titles combined, while many persons holding corrections titles in DOCS for 10 or 15 years of employment, would have been bypassed for promotion. Also, many persons on a managerial level in DOCS believed that the jobs were not comparable, based upon their appraisal of the knowledge, skills and abilities needed to perform in DOCS, fortified by a prior historical difference in the nature of the examinations given for supervisory employment in DOCS as compared with ODAS. This belief may have been unfounded in light of the successful transition at Arthur Kill, but this Court is unprepared

to say that it was not held sincerely by DOCS officials and by those responsible for the decision making at CSC.

There were a number of other contentions asserted at trial. These arguments have varying degrees of merit. All should be viewed against the successful background of the Arthur Kill transition of the ODAS supervisory personnel to DOCS supervisory positions. For example, it was argued that ODAS personnel had never been trained in the use of firearms, batons, gas and related gas equipment, riot control, frisking, or continuous use of firearms. The ODAS facilities were generally minimal security institutions, while many DOCS institutions are of maximum security. The emphasis at ODAS was on treatment and counselling, rather than on custody, although in truth custody constituted a substantial part of the work of the ODAS officer. The inmate-officer ratio is much higher in DOCS facilities, while riots and hostage situations were rare in ODAS institutions.

As a result of the give and take on these points, the initial decision of CSC that ODAS supervisory personnel were comparable to similarly paid DOCS supervisory personnel was ultimately reversed by CSC. Thereafter, ODAS supervisory personnel were certified to be given preferred status only as correction officers, as were non-supervisory ODAS employees.

This issue was presented to the Supreme Court of the State of New York upon the narrow issue of whether the final determination of CSC not to equate the supervisory positions at ODAS with supervisory positions at DOCS was "arbitrary and capricious." The Court, acting only on papers and without an evidentiary hearing, held in two cases that it was not. See *Caffero v. N.Y.S. Civil Service Commission,* (Sup.Ct. Albany Co., Dec. 20, 1976, apparently not officially reported), and *Blackwell v. Preiser,* (Sup.Ct. Bronx Co., Feb. 7, 1975, apparently also not officially reported).

We have noted earlier that a majority of the ODAS supervisory personnel were White, although the minority representation among supervisory personnel was much greater than it was in DOCS. Not every unfair or arguably unreasonable conduct by the state or under color of state law includes the invidious motivation of racial discrimination as a part of the decision making process. Assuming a disparate impact, there is certainly no evidence whatsoever in this trial record which would justify an inference or a finding of purposeful discrimination by a preponderance of credible evidence as required by *General Building Contractors, supra.* For that reason, the supervisory plaintiffs cannot prevail on their claims.

■ We turn now to the contentions of the non-supervisory plaintiffs, Wedderburn and Casiano.

A consideration of the claims of these plaintiffs requires an understanding of the intradepartmental reassignment procedure within DOCS. When a vacancy occurs in the office of Correctional Officer in an institution, COs desiring transfer and having job seniority in other, less desired institutions, are permitted to bid for the vacant job. This is an ordinary incident of employer-wide seniority, followed in much of private industry in this country. It is racially neutral on its face.

For a number of reasons affecting the character of the respective institutions, the types of inmates and the places in which the institutions are located, employment at the so-called "downstate" facilities as a CO is regarded as more desirable than equivalent employment at the "upstate" facilities. Also, for various reasons, including differences in the resident population and the labor pool, the work force of Correctional Officers at downstate facilities has tended to have much higher percentages of minority employees.

Even today, many minority employees do not wish to work and live in essentially rural communities, such as Warsaw, in Wyoming County, New York (location of the celebrated Attica Correctional Facility). These plaintiffs' complaint is simply that they want to work as Corrections Officers,

they would prefer to live downstate, and do not wish to move upstate to work in order to earn sufficient seniority in the system to bid for a downstate job.

Adherence to this facially reasonable seniority system for intradepartmental transfers by DOCS can hardly be said to be the product of *intentional* racial discrimination. It is racially neutral on its face and has a reasonable purpose in that it seeks to promote employee satisfaction and loyalty, by appearing to give more favorable treatment to more senior employees on the issue of lateral transfers. Such preferences are commonly accepted in American industry, and not violative of the rights of plaintiffs here.

### Conclusion

For these reasons, the Court concludes that plaintiffs are entitled to no relief in these cases. The Clerk shall enter a final judgment in each action directing that plaintiffs shall recover nothing. No costs will be awarded in view of the recently changed posture of the case law following trial.

The foregoing constitutes findings of fact and conclusions of law of the Court pursuant to Rule 52, F.R.Civ.P.

So Ordered.