Edward L. KIRKLAND, Joseph P. Bates, Sr., Arthur E. Suggs, each individually and on behalf of all others similarly situated, Plaintiffs,

v.

The NEW YORK STATE DEPART-MENT OF CORRECTIONAL SERVICES;

Thomas A. Coughlin, III, individually and in his capacity as Commissioner of the New York State Department of Correctional Services;

The New York State Civil Service Commission;

Joseph Valenti, individually and in his capacity as President of the New York State Civil Service Commission and Civil Service Commissioner;

Josephine Gambino and James McFarland, each individually and in his/her capacity as Civil Service Commissioner, Defendants.

No. 82 Civ. 0295.

United States District Court, S.D. New York.

Dec. 1, 1982.

NAACP Legal Defense Fund by O. Peter Sherwood, New York City, for plaintiffs.

Robert Abrams, Atty. Gen., State of N.Y. by Barbara B. Butler, New York City, for defendants.

Rowley, Forrest & O'Donnell by Richard R. Rowley, Albany, N.Y., for Althiser intervenors.

Beck, Halberg & Williamson by Herbert B. Halberg, New York City, for McClay intervenors.

## OPINION

GRIESA, District Judge.

This is a motion under Fed.R.Civ.P. 23(e) to approve a class action settlement. The motion is granted.

### The Action

The suit is brought on behalf of black and hispanic Correction Sergeants in the New York State Department of Correctional Services, challenging the legality of Promotional Examination No. 36–808, given for the position of Correction Lieutenant (G–20) on October 3, 1981. The claim is that the test and the resulting eligibility list are racially discriminatory in violation of the Fourteenth Amendment of the United States Constitution, 42 U.S.C. §§ 1981 and 1983, and Titles VI and VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. The complaint seeks declaratory and injunctive relief, as well as damages in the form of back pay for alleged past discrimination.

Defendants are officials in the New York Department of Correctional Services and the New York Civil Service Commission. They have answered denying any unlawful discrimination, and asserting the validity of the test and the resulting eligibility list.

The action was commenced on January 15, 1982. After discovery, followed by extensive negotiations, a settlement agreement was entered into in August 1982. It is this agreement which is the subject of the present application.

Notice of the proposed settlement was properly given. A hearing was scheduled for September 29, 1982. By the time of that hearing no objections were received from any members of the class. However, over 200 written objections were received from non-class members—i.e., white correctional officers. In addition, two groups of white correctional officers, each represented by counsel, moved to formally intervene in the action. On September 29, 1982 the court granted the motions to intervene, specifying that the interventions would be solely for the purpose of objecting to the proposed settlement.

Additional hearings were held on October 4 and October 14, 1982. Briefs have been received from both the plaintiffs and the original defendants in support of the proposed settlement. The intervenors have submitted briefs in opposition.

On November 9, 1982 the court entered an order approving the settlement. The order stated the court's conclusion that the settlement is fair, reasonable and lawful in all respects, and that the objections to the settlement, including the claims of constitutional defects, are without merit. The order stated that an appropriate opinion would be issued in due course.

### Factual Background

The present case must be considered in the context of a prior action brought by Kirkland et al., in which they challenged the promotional examination for the position of Correction Sergeant. The action was commenced in 1973 in this court, and was tried before Judge Lasker, who found that the examination was racially discriminatory. Kirkland v. New York State Department of Correctional Services, 374 F.Supp. 1361 (S.D.N.Y.1974). Judge Lasker directed that the State institute a new selection procedure for Correction Sergeant, and in addition imposed a permanent hiring ratio for minorities. Pending the institution of this procedure, he required an interim ratio.

On appeal, the Second Circuit affirmed the finding of the unconstitutionality of the examination, but reversed the imposition of a permanent minority ratio. It should be noted, however, that the Court of Appeals upheld the interim ratio.

"The court directed that at least one out of four persons so promoted must be

members of the plaintiff class. Since this portion of the decree is interim in nature, does not mandate the making of any promotions, does not disregard an existing civil service eligibility list, and since its benefits are limited to the members of plaintiff's class, we affirm it as not being an abuse of the District Court's discretion." *Kirkland v. New York State Department of Correctional Services,* 520 F.2d 420, 429–30 (2d Cir.1975). The Court of Appeals remanded for the development of a non-discriminatory testing procedure without the use of a permanent ratio.

■ Following the remand, the State developed a new testing procedure consisting of two parts: *first,* a written test primarily designed to assess verbal skills; *second,* performance ratings made by the applicant's departmental superiors. The written test was administered. The resulting scores of the minority applicants were, on the average, somewhat lower than the scores of the white applicants, based on a "criterion-validation study." As a consequence, the Corrections Department re-scored the tests by adding 250 points for every minority applicant.

In further proceedings before Judge Lasker, a group of white correctional officers was permitted to intervene to challenge the 250-point adjustment. Judge Lasker granted summary judgment in favor of the original parties to the action and against the intervenors. The Court of Appeals affirmed. *Kirkland v. New York State Department of Correctional Services,* 628 F.2d 796 (2d Cir.), *cert. denied,* 450 U.S. 980, 101 S.Ct. 1515, 67 L.Ed.2d 815 (1981). The Court held that the 250-point adjustment was not illegal as creating a "quota" since it did not "require that a minimum number of sergeant appointments be given to any members of a minority group." 628 F.2d at 798.

In the previous Court of Appeals opinion, there was a dictum criticizing what was referred to as "bumping" from a preferred position on an eligibility list because of racial considerations. 520 F.2d at 429. In the second Court of Appeals opinion, the Court explained that this earlier discussion related solely to strict racial quotas. The Court stated that the steps taken by the Department of Corrections in connection with the revised selection procedure

> " . . . do not constitute de jure or de facto quotas. This program does not bump white candidates because of their race but rather reranks their predicted performance as estimated by the combined test score and job performance ratings." 628 F.2d at 798.

Finally, the Court gave its overall approval to all phases of relief as finally arrived at after the remand, "including quotas in interim appointments." *Id.*

The promotional examination for Correction Lieutenant, which is at issue in the present case, was administered in October 1981. The State relied strictly on a written test, and did not establish any procedure for performance ratings, as had been done in the reformed selection for sergeants. The results of the test for minority and non-minority applicants were as follows:

|  | Minority | Non-Minority |
|---|---|---|
| Took Test | 169 (22.9%) | 570 |
| Passed Test | 148 (22.0%) | 527 |

Plaintiffs in the present case do not contend that the examination involves racial discrimination on the basis of *pass rate.* The problem raised by plaintiffs relates to the rank-ordering based upon the relative scores of the applicants who passed the test. Plaintiffs have provided the following list, which shows the racial makeup of various groups on the eligibility list.

| Position No. | % Min. | No. Min. | No. Non-Min. |
|---|---|---|---|
| 1–107 | 5.6 | 6 | 101 |
| 108–229 | 9.8 | 12 | 110 |
| 230–298 | 16.0 | 11 | 58 |
| 299–416 | 19.5 | 23 | 95 |
| 417–525 | 29.4 | 32 | 77 |
| 526–619 | 33.0 | 31 | 63 |
| 620–672 | 47.2 | 25 | 28 |

Appointments from the eligibility list commenced in early January 1982. As of July 28, 1982, 202 non-minority applicants had been promoted to Lieutenant from the list, and only 20 minority applicants (9.0%).

Plaintiffs contend that the total 222 applicants promoted as of July 28, 1982 is a statistically significant sample to indicate whether or not the rank-order list improperly discriminates on a racial basis. Plaintiffs' expert calculates the discrepancy between minority and non-minority appointments as of July 28, 1982 to be statistically significant to level of 5.86 standard deviations (exceeding the .001 level of confidence). In *Castaneda v. Partida*, 430 U.S. 482, 496, n. 17, 97 S.Ct. 1272, 1281, n. 17, 51 L.Ed.2d 498 (1977), the Supreme Court commented on the use of statistics in determining whether a plaintiff, complaining about racial discrimination under Title VII, has made out a *prima facie* case. The Court stated that, "if the difference between the expected value [from a random selection] and the observed number is greater than two or three standard deviations," a *prima facie* case is established.

The same trend continued after July 28, 1982. Counsel for intervenors represented that, as of September 29, 1982, 225 appointments to Lieutenant had been made, of which 21 (about 9%) were minority applicants.

### The Settlement Agreement

The settlement agreement contains two basic elements: *first,* measures to adjust the present eligibility list to correct for disproportionate racial impact; *second,* provision for the development of new selection procedures for promotion to Correction Lieutenant and Correction Captain after the current Lieutenant eligibility list has been exhausted.

### Current Eligibility List

It is agreed that the current eligibility list will be used to fill vacancies in the position of Lieutenant until the list is exhausted. None of the parties has offered any evidence as to what length of time will be involved in this. It is further agreed that all applicants who have already been appointed from the list will retain these appointments.

The system of rank-order for further appointments will be changed under the agreement. The persons who passed the test are to be grouped in three "zones" according to their scores (adjusted for the usual veterans and longevity credits). This grouping includes all those who have passed the test, including those who have already received appointments. The following table shows the makeup of the zones:

| Zone | Score Range | Rank Range | No. in Zone |
|------|-------------|------------|-------------|
| 1 | 82.5 + | 1–247 | 233 |
| 2 | 78.0–82.0 | 248–525 | 286 |
| 3 | 73.0–77.5 | 526–672 | 153 |

The 225 appointments which had been made as of September 29, 1982 were mostly from Zone 1. For reasons that will appear from the discussion below, there are circumstances which result in promotions going to applicants in other than strict rank order.

For future promotions from the revised eligibility list, the procedure will be as follows.[1] All candidates within a particular zone will be treated as equally qualified, and a rank-order list will be made up based upon a random assignment. Offers of promotion will be made first to those in the higher ranking zone. Such offers will be made first to minority applicants until the total percentage of minority appointees to all appointees reaches 21%, with the qualification that, notwithstanding the 21% target ratio, no minority applicant in a lower ranking zone will receive an offer until all applicants, both minority and non-minority, in the higher ranking zone or zones have received offers. Once the 21% has been attained, the offers will be made in a ratio of 4 to 1, non-minority to minority.

When a vacancy occurs at a given facility, it will be offered only to those applicants who have designated a willingness to accept appointment at that facility, or in the same general location. If a vacancy occurs at a facility or location which no

---

1. The basic features are contained in the settlement agreement. However, certain further details described herein were provided by counsel at the hearing of September 29, 1982 and are contained in the minutes thereof.

minority applicant has designated, the position will be offered to non-minority applicants. Thus, depending on where a particular vacancy occurs, non-minority applicants may be chosen despite the fact that the 21% target ratio has not been achieved.

An indication of the number of minority promotions that may be necessary to achieve the 21% target ratio can be obtained by starting with the 225 appointments made as of September 29, 1982 (204 non-minority and 21 minority). If 32 minority appointments are made, the total appointments would be 257 of which 53 (or 21%) would be minority.

*New Selection Procedures Following Exhaustion of Current Eligibility List*

The settlement agreement requires the parties to cooperate in the development of new selection procedures for promotion to Lieutenant and Captain, to be used after the current eligibility list is exhausted. The objective is to avoid unfavorable racial impact and ensure equal opportunity of advancement for both minority and non-minority personnel. The settlement agreement contains an express undertaking to attempt the development of devices other than written tests as components of the new selection procedure. The agreement provides for a number of detailed steps to ensure the validity of the selection procedure.

*Reasonableness and Legality of Settlement*

The settlement agreement in the present case is a logical outcome of the prior *Kirkland* litigation involving the procedure for promotion to Correction Sergeant. The Court of Appeals in that case approved an interim ratio for minority appointments designed to deal with the specific problems of racial discrimination arising from the test in question. Also, on the remand following the first Court of Appeals opinion, the State recognized that the rank-order list created by the new testing procedure still raised problems of racial discrimination, and the State voluntarily adjusted the scores of the minority applicants to improve their position on the list. In its second opinion, the

Court of Appeals upheld this adjustment. Another feature of the Sergeants' litigation was the development of new selection procedures departing from sole reliance on a written examination. This was also approved by the Court of Appeals.

Thus, the basic features of the settlement agreement in the present case find clear precedent in the Sergeants' litigation—departure from a strict rank-order eligibility list based on test results; an interim ratio for minority promotional appointments; and development for the long term of a new selection procedure.

The present settlement agreement is not only justified by legal precedent, but is inherently reasonable and sound as a matter of policy. The benefits to plaintiff class of minority applicants inevitably result in some detriment to non-minority correctional officers competing for promotion to the rank of Lieutenant. However, the benefits to plaintiff class are modest and are carefully tailored to the precise problem raised by them in the litigation. By the same token, the detriment to the non-minority applicants is also modest and is in fact considerably less than what might have occurred if plaintiffs had pressed their litigation to the end and not agreed to a settlement.

The first point to be made in this regard is that the strict rank-order list originally resulting from the Lieutenant test involved differentiations among the candidates which were altogether arbitrary. It is recognized as an obvious fact that slight differences in the scores achieved mean virtually nothing as far as the merits of the candidates respecting performance of duty. It is equally obvious that ranking according to zones, as will be done under the settlement agreement, will involve a far more realistic recognition of what the test scores mean regarding the actual merits of the candidates. It is, of course, true that there is serious doubt about the entire concept of a written test as the criterion for the ranking of candidates for positions such as the one in question. However, the zone system is at least a step towards a realistic solution

to that problem. If the settlement agreement provided only for the grouping of the applicants in zones, and the ranking within the zones by random selection, the settlement agreement would involve a truly "color-blind" rank order list.

However, if the settlement agreement went no farther than this, it would provide no remedy for the disproportionate number of non-minority applicants in the promotions which have already been made. It should be noted that, if the litigation had proceeded to its conclusion and plaintiffs had prevailed, all of those appointments could well have been declared null and void. The settlement agreement takes a much more modest approach. All of the appointments thus far made (225 as of September 29) will remain in effect. What is provided in the settlement agreement to adjust the balance is that, subject to certain details previously noted, future appointments will be offered first to minority applicants until the ratio of minority appointments will equal 21% of the whole. This does not deny promotion to any of the remaining non-minority applicants. At most, it postpones the promotion of such applicants initially until approximately 30 minority applicants have received appointments. After the target ratio is accomplished, non-minority applicants will receive four appointments for every minority appointment. This is roughly the racial composition of those who passed the test. It is hardly a substantial detriment to the non-minorities.

With regard to the development of new selection procedures following the exhaustion of the current eligibility list, the settlement agreement is eminently sound. It envisages departure from the sole use of the written test and the development of racially neutral selection procedures better designed to relate to the merits of candidates in regard to job performance.

2. Objectors also argue in their briefs that in addition to proof of disproportionate impact and a lack of job-relatedness of the test in question, there must be a demonstration of "past egregious racial discrimination" (e.g., purposeful discrimination) before affirmative relief may be approved in a Title VII context, relying on *Washington v. Davis,* 426 U.S. 229,

The two principal contentions of the objectors in opposition to the settlement agreement are as follows:

*First,* they contend that, before any affirmative relief may be granted to plaintiff class, there must be a full trial regarding the issue of the racially discriminatory nature of the examination in question and the eligibility list. This means, according to the objectors, not merely a statistical showing of racially disproportionate impact, but also a trial and judicial determination on the question of the job-related nature of the examination. The objectors urge that, even if the State does not desire to prove the job-relatedness of the examination, the objectors themselves should have the opportunity to do so.[2]

*Second,* even if the record would justify the granting of some relief to plaintiff class by way of settlement, the racial preferences granted to the minority applicants under the settlement agreement violate both the Federal Constitution and the state Civil Service Law.

*Proper Basis for Settlement*

The objectors' first contention flies in the face of an age-old judicial policy favoring voluntary settlement of litigation. The courts have specifically espoused this policy in connection with Title VII actions. Indeed, the Supreme Court made clear in *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974), that voluntary settlements of Title VII actions are "the preferred means for achieving [the statutory] goals ... [of] assur[ing] equality of employment opportunities by eliminating those practices and devices that discriminate on the basis of race." In this regard, the Supreme Court noted

96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The citation of the latter case is misplaced, since it dealt with standards under the Equal Protection Clause. The court stated there that the requisite showing under Title VII involved a lesser standard than that required under the "constitutional rule." 426 U.S. at 238–39, 96 S.Ct. at 2047.

recently that a refusal to approve a proposed settlement decree under Title VII is an appealable order because such refusal undermines a fundamental policy underlying Title VII by denying the parties the opportunity to compromise their claims and to obtain prompt injunctive relief contained in the settlement agreement they have negotiated. *Carson v. American Brands, Inc.,* 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998, n. 14, 67 L.Ed.2d 59 (1981).

The courts have stated that the settlement of a Title VII action is entitled to a presumption of validity when objections are made to such a settlement. *United States v. City of Miami,* 664 F.2d 435, 440 (5th Cir.1981) (en banc); *United States v. City of Alexandria,* 614 F.2d 1358, 1362 (5th Cir. 1980). In Title VII class actions, it has been said that there is a "strong presumption in favor of settlement." *Guardians Association of New York City v. Civil Service Commission,* 527 F.Supp. 751, 757 (S.D. N.Y.1981).[3]

The objectors rely mainly on two authorities as supporting their first contention. They cite *Patterson v. Newspaper and Mail Deliverers' Union of New York,* 384 F.Supp. 585 (S.D.N.Y.1974).[4] This was a Title VII action (although not a testing case) which was settled after four weeks of trial. Judge Pierce handed down an opinion approving the settlement. The objectors in the present case rely on the following statement from the opinion:

> "[A]lthough the court is of the opinion that even at this late stage public policy is served by an agreement rather than an adjudication, a more searching discussion of the merits is warranted. In fact, the state of law in this circuit may require certain findings of fact to support affirmative action in a Title VII case even where it is resolved by settlement." 384 F.Supp. at 588.

There is nothing whatever in this statement which indicates that a Title VII action cannot be settled before trial, or that in a Title VII testing case there must be trial and judicial findings on all phases of the merits of the case before the action can be settled. Judge Pierce was simply making appropriate findings regarding the reasonableness and legality of the settlement before him, since objections were posed to that settlement. Since Judge Pierce had the benefit of a record of four weeks of trial, he naturally availed himself of that record to make detailed findings.

The other authority cited by the objectors is *United States v. City of Miami,* 614 F.2d 1322 (5th Cir.1980), *rev'd in part,* 664 F.2d 435 (5th Cir.1981) (en banc). In the panel decision, 614 F.2d 1322, the court of appeals affirmed the district court's approval of a consent decree in a Title VII action brought by the Government. This consent decree purported to bind a labor union, which was named as a defendant in the action and which had not agreed to the consent decree. The case was reheard en banc, resulting in a ruling that the union could not be bound by the consent decree insofar as the decree adversely affected the union's rights under a collective bargaining agreement. 664 F.2d at 442.

*City of Miami* is of little assistance to the objectors in the present case. *City of Miami* stands for the obvious proposition that a consent decree cannot bind a defendant who does not consent. In the present case all the defendants in the action have agreed to the settlement. The objections come from persons who were not named as defendants, but who claim that they will be affected by the relief provided for in the settlement agreement. This presents a different problem from what was dealt with in the holding in *City of Miami.*

It is of interest to note that the plurality opinion in *City of Miami* contains a dictum referring to the latter problem—the question of the adverse effect of a consent decree or settlement upon persons not parties to the litigation. This dictum recognizes

---

**3.** The litigation by the Guardians Association occurred in several stages. The above opinion will hereafter be referred to as "*Guardians II.*"

**4.** *Aff'd* 514 F.2d 767 (2d Cir.), *cert. denied,* 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976).

the power of a court to approve such a consent decree or settlement as long as the court gives due consideration to such adverse effect and finds, on balance, that "the effect on them is neither unreasonable nor proscribed." 664 F.2d at 441.

Although settlements of Title VII litigation are favored and are accorded a presumption of validity against objections, nevertheless it must be recognized that, to the extent that such settlements accord preferences to minorities, there will usually be some detriment to non-minorities. These non-minorities are often not parties to the litigation. Consequently, a settlement of a Title VII class action may well raise issues of a broader nature than are involved in the usual class action settlement, where basically only the immediate parties are affected, and where the main consideration of the court in assessing the settlement is adequacy to the members of the class.

In the present case, regardless of how moderate is the preference given to the minority members of plaintiff class, and how modest is the detriment to the non-minority correction officers, there is *some* detriment to the latter. Consequently, it is necessary that there be a reasonable basis for imposing such detriment.

Clearly, if there were no bona fide question of racial discrimination, and if nothing were being done but to provide a gratuitous preference for blacks and hispanics, there would be no basis for court approval of such an arrangement under Title VII. Certainly there must be a showing in some form that there is at least a serious claim of racial discrimination against the plaintiff class, before a settlement can be approved which adversely affects non-minority persons.

■■■ Here, plaintiff class has made such a showing. Plaintiffs have established a *prima facie* case of Title VII employment discrimination through their uncontested statistical demonstration of disproportionate racial impact respecting the eligibility list. Such a statistical showing creates a "presumption of Title VII discrimination." *Guardians Association of New York City v. Civil Service Commission,* 630 F.2d 79, 88 (2d Cir.), *cert. denied,* 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981) ("*Guardians I*").[5] In a Title VII action relating to employment testing, where such a showing has been made, the defendants must come forward with proof that the test is job-related, or otherwise the court is obligated to render a decree in favor of the plaintiffs. *Guardians I, supra,* at 88; *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

In the present case defendants have chosen not to litigate the job-relatedness of the test and the eligibility list, but have chosen the path of voluntary settlement. There is ample authority in favor of settlement of Title VII class actions under these circumstances.

The action of the State in settling the present case is, in principle, a voluntary adoption of an affirmative action plan. Therefore certain discussion in *Regents of University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), is relevant. There the Supreme Court held that a permanent racial quota in a state university system should be struck down, but also held that the system is not constitutionally foreclosed from instituting certain kinds of racial considerations and preferences in admissions procedures. 438 U.S. at 320, 98 S.Ct. at 2763. In their concurring and dissenting opinion, Justices Brennan, Marshall, White and Blackmun made the following statement (such statement being part of their concurrence):

"Indeed, the requirement of a judicial determination of a constitutional or statutory violation as a predicate for race-conscious remedial actions would be self-defeating. Such a requirement would severely undermine efforts to achieve voluntary compliance with the requirements of law. And, our society and jurisprudence have always stressed the value of voluntary efforts to further the objec-

**5.** *See* footnote 3 *supra.*

tives of the law. Judicial intervention is a last resort to achieve cessation of illegal conduct or the remedying of its effects rather than a prerequisite to action." 438 U.S. at 364, 98 S.Ct. at 2786.

In *United States v. City of Alexandria,* 614 F.2d 1358 (5th Cir.1980), the court of appeals approved a consent decree in a Title VII case, and rejected the argument that, before such a decree could be entered, the employer must first be adjudged guilty of discriminatory employment practices. The court stated:

"We have never heard of any doctrine of law which requires a defendant to put on a defense to rebut a prima facie case. . . . The defendant may simply claim that the plaintiff's case is insufficient, and choose to present no evidence. If this had occurred in the instant case or if the evidence presented by the defendants had been insufficient to rebut the government's case, the trial court would have been obligated to enter a decree against the defendants." 614 F.2d at 1364.

In *Prate v. Freedman,* 583 F.2d 42 (2d Cir.1978), the Second Circuit dealt with a collateral attack made upon a Title VII consent judgment by persons who were not parties to the action but who were affected by the judgment. These parties argued that a plan for preferential minority hiring in the judgment was unsupported by a sufficient showing of unlawful discrimination. The court rejected this contention, holding that admission of "disproportionate impact, unrebutted by any suggestion that the contested practices were 'job-related' amounted to an admission of unlawful discrimination for purposes of Title VII." 583 F.2d at 47. Moreover, the court noted: "Our decision in *United States v. Wood, Wire & Metal Lathers Union* [471 F.2d 408, 413 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973)] foreclosed the argument that preferential hiring relief may only be based on a formal finding of past discrimination made after an evidentiary hearing." *Id.* at 47, n. 4.

In *Vulcan Society v. Fire Department of White Plains,* 505 F.Supp. 955 (S.D.N.Y. 1981), Judge Sofaer approved a settlement of a Title VII action. A portion of that settlement involved hiring procedures for the New Rochelle fire department. Judge Sofaer noted the existence of a *prima facie* case in favor of plaintiffs on the basis of uncontested statistics, and stated that the "racial imbalance . . . is substantial enough to justify the voluntary adoption of a hiring ratio designed to eliminate the disparity." 505 F.Supp. at 962. Similarly, in *Guardians II,* 527 F.Supp. 751, 757 (S.D.N.Y.1981), Judge Carter approved a settlement of a Title VII testing action on the basis that plaintiffs had established a *prima facie* case and there had been bona fide arm's-length bargaining. The elements found in the *Vulcan* and *Guardians* cases are present in the case at bar.

Thus, on the basis of both reasoning and precedent, it is clear that the objectors cannot force the defendants in this action to a trial of plaintiffs' claims, nor do the objectors have any right to defend these claims themselves. The proponents of the settlement agreement have made a sufficient showing of serious questions of racial discrimination under Title VII to justify a remedy which affords carefully measured employment preferences to plaintiff class.

*Lawfulness of Remedy*

The objectors contend that the proposed settlement violates both the New York Constitution and the state Civil Service Law by departing from the principle that promotions in the state Civil Service are to be made by competitive examination.

Both the New York Constitution and the Civil Service law require that promotions shall be according to merit and fitness, to be ascertained, as far as practicable, by competitive examination. *See* New York State Constitution, Art. V, § 6; Civil Service Law §§ 50–52, 61. However, neither the constitution nor the statute specifies any particular method of examination or grading. *See Matter of Katz v. Hoberman,* 28 N.Y.2d 530, 532, 319 N.Y.S.2d 73, 267 N.E.2d 886, cert. denied, 404 U.S. 881, 92 S.Ct. 203, 213, 30 L.Ed.2d 163 (1971); *Matter of Mitchell v. Poston,* 41 A.D.2d 886, 342

N.Y.S.2d 482 (4th Dep't 1973). The reorganization of the rank-order eligibility list in the present case into zones is a reasonable step on the part of the Civil Service Commission to make the list accord with merit and to have arbitrary and unfair rankings eliminated. *See Matter of Sullivan v. Taylor,* 285 A.D. 638, 639, 140 N.Y.S.2d 58 (1st Dep't 1955).

■ Insofar as the 21% and one-to-four ratios are concerned, it is unnecessary to determine whether they would be in accordance with state law. It is clear that state law must yield to federal law in a Title VII case. *See Guardians I,* 630 F.2d at 104–5.

This brings us to the question of whether the ratios provided for in the settlement agreement in the present case are valid under federal law. It is clear that they are.

■ The objectors contend that their positions on the original rank-order eligibility list constitute vested property rights, which would be taken away without due process of law by the settlement agreement. This argument is wholly without merit. A position on an eligibility list is not a property right. The New York Court of Appeals has held this to be so under both the New York and Federal Constitutions. *Cassidy v. Municipal Civil Service,* 37 N.Y.2d 526, 529, 375 N.Y.S.2d 300, 337 N.E.2d 752 (1975).

The objectors further contend that the 21% and four-to-one ratios are "quotas" favoring the minority applicants, which violate the equal protection rights of the non-minority applicants. This argument is also without merit.

A number of decisions, some of them cited by the objectors, condemn the use of racial quotas except under particular circumstances. *See, e.g., Kirkland v. New York State Department of Correctional Services,* 520 F.2d 420, 427–30 (2d Cir.1975); *Guardians I,* 630 F.2d at 108–9. It is not necessary here to engage in any full discussion of what it is that constitutes an unlawful quota. The essential point, for present purposes, is that the settlement agreement in this case *is not* such a quota. The authorities leave no doubt about this.

At the outset, it is of interest that the Second Circuit has specifically recognized the arbitrary nature of a strict rank-order eligibility list based on a written test. In the course of its opinion in *Guardians I,* the court discussed what the City of New York could have lawfully done in departing from such a rank-order list:

"[T]he employer can acknowledge his inability to justify rank-ordering and resort to random selection from within the entire group that achieves a properly determined passing score, or some segment of the passing group shown to be appropriate.... Since each of the scores between 94 and 97 was achieved by more than 2,000 candidates, and since each training class can accommodate slightly more than 400 candidates, the test scores provide no basis for selecting from among candidates at each of these scoring levels." 630 F.2d at 104.

It seems obvious that, in the present case, the State has the power to reorganize the rank-order list in question by use of the zones as proposed. As described earlier, if the settlement agreement went no farther, this would be the basis for a truly color-blind selection process. However, the settlement does go farther, and provides for the 21% and one-to-four ratios.

The cases fully support these ratios, and show that they are not unlawful quotas. As already noted, the first court of appeals opinion in the *Kirkland* sergeants case approved interim minority ratios, while disapproving a permanent quota. *Kirkland, supra,* 520 F.2d at 429–30.

In *Association Against Discrimination v. City of Bridgeport,* 647 F.2d 256 (2d Cir. 1981), the court approved, with modifications, a remedy in a Title VII case in which 102 firefighter positions were to be offered to minority applicants ahead of non-minority applicants. The court termed this a "hiring goal" rather than a "quota." For one thing, the remedy was interim rather than permanent in nature. In *Guardians I* the court approved a minority hiring ratio. The court again dealt with the concept of an interim remedy versus a permanent one

 

and defined "interim" as "the time period between the date of a decree and the subsequent use of a valid selection procedure." 630 F.2d at 110. The court stated that it is an appropriate interim remedy under Title VII to provide for a hiring preference "reflecting the minority ratio of the applicant pool or the relevant work force." 630 F.2d at 109. The settlement agreement in the present case provides for reasonable hiring goals on an interim basis within the meaning of these decisions.

Another feature of a valid ratio or hiring goal, as defined in this circuit, is that it is tailored to the specific discrimination claims of members of the plaintiff class, and does not establish broader-ranging benefits to minority applicants in general, and corresponding detriment to non-minorities. *Kirkland, supra,* 520 F.2d at 430. This description fits precisely the settlement agreement in the present case.

The above analysis is consistent with the Supreme Court's decision in *United Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), in respect to the legality of voluntary affirmative action plans—particularly as to the permissible effects on non-minority employees. The Court stated that the plan in that case did not "unnecessarily trammel the interests of white employees," because it did not require the discharge of white workers; it did not create an absolute bar to their advancement; and it was a temporary measure. Further, it was not intended to maintain racial balance but simply to eliminate a racial imbalance. 443 U.S. at 208, 99 S.Ct. at 2729.

These characteristics are present in the case at bar.

*Other Contentions of Objectors*

Various contentions have been made by the objectors in oral argument and in their written submissions. The ones that have been dealt with at length in this opinion appear to be their principal contentions, although it must be said that the delineation and articulation of points by the objectors was not crystal clear.

All of the points made by the objectors have been carefully considered. None of them has merit.

*Conclusion*

For the foregoing reasons, the settlement agreement is approved and the objections thereto are overruled.