James BUSHEY, Roger D. Bell, Robert W. Ferber, William J. Norton, Robert J. Seitz, George Bartlett, Charles Page, Wayne Wilhelm, Wayne L. Strack, Robert Fucci, Gary H. Filion, Edward D. Rogan, Miles Barnes, Donald E. Clark and Gerald Sweeney, each individually and on behalf of all others similarly situated, Plaintiffs,

v.

The NEW YORK STATE CIVIL SERVICE COMMISSION; Joseph Valenti, in his capacity as President of the New York State Civil Service Commission and Civil Service Commissioner; Josephine Gambino and James McFarland, in their capacity as Civil Service Commissioners; The New York State Department of Correctional Services; and Thomas A. Coughlin, III, in his capacity as Commissioner of the New York State Department of Correctional Services, Defendants,

Gerald A. Wells, Wilbur I. Wright, Joseph P. Bates, Thomas D. Haskell and Percy Jones, Defendants-Intervenors.

No. 82–CV–1219.

United States District Court, N.D. New York.

Oct. 3, 1983.

1562b

Robert Abrams, Atty. Gen. of the State of N.Y., New York City, for defendants; Melvyn R. Leventhal, Barbara B. Butler, Brenda S. Spears, Ann Horowitz, Asst. Attys. Gen., New York City, of counsel.

Donovan, Leisure Newton & Irvine, New York City, for defendants-intervenors;

Paul A. Crotty, John D. Shyer, Greta Glavis, New York City, of counsel.

Rowley, Forrest & O'Donnell, P.C., Albany, N.Y., for plaintiffs; Richard R. Rowley, Ronald G. Dunn, Albany, N.Y., of counsel.

## MEMORANDUM–DECISION and ORDER

MINER, District Judge.

### I

This rather novel reverse discrimination action arises out of the alleged racially discriminatory treatment of non-minority plaintiffs in the context of their civil service employment with the State of New York. The action is brought pursuant to 42 U.S.C. §§ 1981 and 1983, and Titles VI[1] and VII[2] of the Civil Rights Act of 1964. Jurisdiction is predicated upon 28 U.S.C. §§ 1331 and 1343. Before this Court are motions by all parties[3] for summary judgment pursuant to Fed.R.Civ.P. 56(a) & (b).

### II

The relative simplicity of the facts surrounding this controversy belies the rather subtle and intricate legal issues which are raised. Plaintiffs, fifteen white employees of the Department of Correctional Services ("DOCS"),[4] commenced this action on November 8, 1982 seeking to enjoin[5] defendants from making promotions on the basis of a controversial "eligible list." This list was derived from the results of Civil Service Examination No. 37–526 ("examination"). The examination, developed, administered and scored by defendant New York State Civil Service Commission ("CSC"), was taken by plaintiffs in January of 1982 in order to compete for promotion to the

---

1. 42 U.S.C. §§ 2000d—2000d–4 (1981).

2. 42 U.S.C. §§ 2000e–2—2000e–17 (1981).

3. By an earlier unpublished Order of this Court, dated February 16, 1983, Gerald A. Wells, Wilbur I. Wright, Joseph P. Bates, Thomas D. Haskell and Percy Jones were permitted to intervene in the present action as parties defendant, pursuant to Fed.R.Civ.P. 24(b)(2).

   While the present action as commenced purports to be a class action brought on behalf "of all others similarly situated," plaintiffs have not yet moved this Court for class certification pursuant to Fed.R.Civ.P. 23(c).

4. Plaintiffs are all permanent Correction Lieutenants with an average of 19 years of service with the Department of Correctional Services.

5. Plaintiffs' request for preliminary injunctive relief subsequently was withdrawn after the parties stipulated that no further appointments to the position of Correction Captain would be made pending further order of this Court.

rank of Correction Captain. The present controversy centers upon the actual grading of the examination by defendant CSC. Essentially, plaintiffs claim that minority candidates' test scores improperly were supplemented with a "racial bonus" in order to compensate for an alleged adverse racial impact contained in the written test. A full understanding of the scoring methodology employed, and the claimed need for its use here, requires a brief survey of past litigation involving Corrections Department personnel.

In 1972, CSC, upon request of DOCS, prepared an examination to be taken by Corrections Department Officers in order to qualify for promotion to the rank of Sergeant. The examination was administered on October 14, 1972. Alleging that the test improperly discriminated against them on the basis of race, black and Hispanic Correction Officers challenged the test's constitutional validity. *Kirkland v. New York State Department of Correctional Services,* 374 F.Supp. 1361 (S.D.N.Y.1974), *aff'd in part, rev'd in part,* 520 F.2d 420 (2d Cir. 1975), *cert. denied,* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976) ("*Kirkland Sergeants*"). Judge Lasker determined that the Sergeants exam did indeed discriminate against minorities and ordered DOCS to develop new selection procedures to be validated by means of an empirical, criterion-related study. Between 1974 and 1979, DOCS attempted to comply with Judge Lasker's order and put forth its proposal for new selection procedures. The new proposal, which called for the addition of 250 points to the test scores of minority candidates,[6] was held by Judge Lasker to have satisfied the requirements established by the Second Circuit in their affirmance of his initial order. *Kirkland v. New York State Department of Correctional Services,* 482 F.Supp. 1179 (S.D.N.Y.), *aff'd,* 628 F.2d 796 (2d Cir.1980), *cert. denied,* 450 U.S. 980, 101 S.Ct. 1515, 67 L.Ed.2d 815 (1981).

In January of 1982, minority Correction Sergeants lodged a further challenge to DOCS' procedures, claiming that the promotional examination for the position of Correction Lieutenant was racially discriminatory against blacks and Hispanics. On August 20, 1982, the parties to the suit submitted proposals of settlement to Judge Griesa of the Southern District of New York. On November 9, 1982, Judge Griesa approved the proposed settlement. *Kirkland v. New York State Department of Correctional Services,* 552 F.Supp. 667 (S.D. N.Y.1982), *aff'd,* 711 F.2d 1117 (2d Cir.1983). The settlement agreement provided measures both to eradicate all disproportionate racial impact resulting from administration of the Lieutenants examination as well as provisions for the development and administration of new selection procedures for promotion to Correction Lieutenant and Correction Captain. Holding that "voluntary compliance is a preferred means of achieving Title VII's goal of eliminating employment discrimination," the Second Circuit affirmed Judge Griesa's approval of the settlement agreement. *Kirkland v. New York State Department of Correctional Services,* 711 F.2d 1117, 1128 (2d Cir.1983) ("*Kirkland Lieutenants*").

Against this background, and apparently in an effort to forestall a third *Kirkland*-type suit with respect to the Captains examination, CSC took it upon itself to adjust minority candidates' scores upward, thereby eliminating what it perceived to be the adverse racial impact of the Captains test. It is this anticipatory defensive maneuver which serves as the basis for the instant action.

*The Civil Service Framework*

In New York, the State Civil Service Commission is charged with administration of the state's civil service system. N.Y.Civ.

---

**6.** The new testing procedure entailed two distinct parts. First, it called for a written test designed to assess verbal skills. Second, performance ratings were to be made by the candidates' departmental superiors. After administration of the written test, it was discovered that minority scores were, on the average, somewhat lower than those of non-minority candidates. Accordingly, CSC rescored the tests by adding 250 points to the minority applicants' scores. *See Kirkland v. New York State Department of Correctional Services,* 552 F.Supp. 667, 669 (S.D.N.Y.1982), *aff'd,* 711 F.2d 1117 (2d Cir.1983).

Serv.Law § 6 (McKinney 1983). The procedures regarding civil service examinations and appointments are greatly detailed and are set forth in the Civil Service Law. The overriding theme of the civil service system expresses the fundamental purpose that appointments be based on merit. *E.g.,* N.Y. Const. art. V, § 6 ("Appointments and promotions in the civil service of the state and all of the civil divisions thereof ... shall be made according to merit and fitness to be ascertained, so far as practicable, by examination which, as far as practicable, shall be competitive ...."); N.Y.Civ.Serv.Law § 52(2) (McKinney 1983) ("Promotion shall be based on merit and fitness as determined by examination ...."); *Matter of Andresen v. Rice,* 277 N.Y. 271, 14 N.E.2d 65 (1938) ("The fundamental purpose running through our civil service provisions is that, so far as practicable, positions in the State service shall be filled by competitive examinations"). Section 95 of the Civil Service Law provides that:

It shall be the duty of all officers of the state of New York ... to conform to and comply with and to aid in all proper ways in carrying into effect the provisions of this chapter, and the rules and regulations prescribed thereunder. No officer or officers having the power of appointment or employment shall appoint or select any person for appointment, employment, promotion or reinstatement except in accordance with the provisions of this chapter and the rules and regulations established thereunder.

N.Y.Civ.Serv.Law § 95 (McKinney 1983).

■ With respect to examinations, § 66.2 of the Rules and Regulations of the Department of Civil Service provides that "[n]o candidate shall be passed in an examination or have his name entered upon an eligible list who fails to attain a passing mark in the examination as a whole ...." While the Civil Service Commission is thus constrained to act within the confines of its legislative mandate, a fragile balance is brought to bear when that mandate is alleged to interfere with citizens' constitutional rights. More specifically, if strict compliance with the mandated merit procedures were to lead to illegal racial discrimination under, for example, a Title VII analysis, then the state law must yield to this overriding federal constitutional consideration. *See Guardians Association of the New York City Police Department, Inc. v. Civil Service Commission,* 630 F.2d 79, 104–05 (2d Cir.1980), *cert. denied,* 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981). In this light, a consideration of the propriety of defendants' remedial actions will be undertaken.

### The Examination

■ Examination No. 37–526 was administered on January 30, 1982. After the candidates' raw scores had been compiled, CSC reviewed the test scores to determine whether the examination had an adverse impact upon racial or ethnic minorities. Based on the raw scores, 119 out of 243 (forty-nine percent) non-minority candidates passed the examination. Only eight out of thirty-two (twenty-five percent) minority candidates achieved a passing score. Applying the four-fifths rule of the EEOC Uniform Guidelines on Employee Selection, 29 C.F.R. § 1607.4[D],[7] CSC concluded that there was in fact an adverse impact upon minority candidates. Accordingly, in order to effect prospective compliance with Title VII, CSC determined to adjust minority scores upward. The statistical methodology employed by CSC to effect the adjustment was that of "separate frequency distribution." Essentially, the process entails pre-

---

**7.** The four-fifths rule essentially provides that a selection rate for any race, sex or ethnic group that is less than four-fifths (80%) of the rate for the group with the highest selection rate will be regarded as evidence of adverse impact. For example, in the case of the Captains exam, the non-minority pass rate was approximately 50%, while the minority pass rate was only 25%. Twenty-five percent is considerably less than 80% of 50%. The opinions of the Second Circuit consistently have held that adverse impact is demonstrated by violation of the four-fifths rule. *E.g., Teal v. Connecticut,* 645 F.2d 133, 137 (2d Cir.1981), *aff'd,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982); *Guardians Association of the New York City Police Department, Inc. v. Civil Service Commission,* 630 F.2d 79, 88 (2nd Cir.1980), *cert. denied,* 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981).

paring separate distributions of minority candidates in score order and nonminority candidates in score order, and equating the scores of each group by normalizing the separate frequency distribution. The result of the adjustment was to increase the number of minorities who passed the exam to sixteen out of thirty-two (fifty percent) compared with the raw score pass rate of eight out of thirty-two (twenty-five percent).[8]

Plaintiffs contend that an adjustment made solely on the basis of race violated their constitutional rights by affording minorities a "racial bonus." Defendants, on the other hand, claim that the use of the separate frequency distribution was necessary in order to comply with Title VII. In other words, to the extent defendants perceived adverse racial impact, they now claim to be entitled to a prospective compliance defense under Title VII.

## III

On motions for summary judgment, it is well established that the court's function "is not to resolve issues of fact but to determine whether any material factual issues are raised after resolving all questionable inferences in favor of the party against whom the judgment is sought. Only if no material factual issues exist may summary

judgment be granted." *United States v. Matheson,* 532 F.2d 809, 813 (2d Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976); *see also Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 444–45 (2d Cir.1980); *Heyman v. Commerce & Industry Insurance Co.,* 524 F.2d 1317, 1319 (2d Cir.1975). Although the moving party bears the burden of clearly establishing the non-existence of any issue of fact that is material to a judgment in his favor, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157–61, 90 S.Ct. 1598, 1608–10, 26 L.Ed.2d 142 (1970), the party opposing summary judgment must "set forth specific facts showing that there is a genuine issue for trial," in order to defeat the motion. Fed. R.Civ.P. 56(e). It is clear from the discussion which follows that defendants have failed to establish the existence of any disputed fact issues warranting the denial of plaintiffs' motion. More particularly, defendants have come forward with no evidence controverting that which has been proffered by plaintiffs with respect to the impropriety of defendants' actions.

## IV

■ Essentially, plaintiffs' complaint raises alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17 (1981).[9] There is no question that

8. It is interesting to note defendants' contention that since the adjustment only added the names of eight minorities to the eligible list and did not result in an attendant "bumping" of eight non-minorities from the list, that the effect with respect to non-minorities was an innocuous one. This is simply not correct. Since appointments to Captains positions are made beginning with those at the top of the eligible list, a shuffling of the order of the list creates the adverse impact. That is to say, as more promotions are made further down the list, a displacement of non-minorities by minorities will serve either to delay a non-minority's promotion or to bar it entirely when all the positions have been filled. *See* N.Y.Civ. Serv.Law § 61.1 (McKinney 1983) ("Appointment or promotion from an eligible list to a position in the competitive class shall be made by the selection of one of the three persons certified by the appropriate civil service commission as standing highest on such eligible list who are willing to accept such appointment or promotion"); Defendants' answer, ¶ 21 ("admit that Commissioner Coughlin has, in the past,

made appointments from eligible lists in the order in which names appear on said lists").

9. Title VII provides:
(a) It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
42 U.S.C. § 2000e–2(a).
Plaintiffs' complaint also asserts, pursuant to 42 U.S.C. § 1983, a violation of their fourteenth amendment rights under the United States Constitution, as well as violations of 42 U.S.C.

Title VII prohibits racial discrimination against whites as well as non-whites. *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 279–80, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493 (1976); *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). "This conclusion is in accord with uncontradicted legislative history to the effect that Title VII was intended to 'cover white men and white women and all Americans,' . . . and create an 'obligation not to discriminate against whites . . . .'" *McDonald v. Santa Fe,* 427 U.S. at 280, 96 S.Ct. at 2578 (quoting 110 Cong.Rec. at 2578 (remarks of Rep. Celler), 7218 (memorandum of Sen. Clark)). It is uncontroverted that defendants effected the score adjustment in favor of minorities solely on the basis of racial considerations. However commendable may have been defendants' motives, e.g., an effort to remedy what was perceived to be a discriminatory pattern against minorities, the guiding legal principles cannot be sidestepped. By its terms, Title VII expressly prohibits the actions undertaken by defendants:

> It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race . . . or . . . to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color . . . or national origin.

42 U.S.C. § 2000e–2(a).

It cannot be, indeed is not, disputed that, by rescoring the examination, defendants succeeded in discriminating against plaintiffs. What is in dispute, and what presents a difficult and rather novel legal question is whether defendants' actions here may be justified in the name of prospective compliance with Title VII. At its most basic level, defendants' argument is this: Given the defendants' perception of the examination's adverse impact upon minorities and the inevitable prospect of a *Kirkland*-type suit, it was wholly proper to initiate unilateral, remedial action and thereby achieve Title VII compliance vis-a-vis minorities without incurring the expense and disruption of an eventual minority suit. *See* Affidavit of John McKenna, ¶ 17. While defendants' intentions well may have been laudable, *cf. Carson v. American Brands, Inc.,* 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981) (strong preference for voluntary settlement of Title VII cases); *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974) (same); *Kirkland Lieutenants,* 711 F.2d at 1128 (same); *Berkman v. City of New York,* 705 F.2d 584, 597 (2d

§ 1981 and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Both the fourteenth amendment and the § 1981 claims are not maintainable, as plaintiffs have failed to prove the necessary element of discriminatory intent. *General Building Contractors Association, Inc. v. Pennsylvania,* 458 U.S. 375, 382–391, 102 S.Ct. 3141, 3146–50, 73 L.Ed.2d 835 (1982) (§ 1981); *Washington v. Davis,* 426 U.S. 229, 239–41, 96 S.Ct. 2040, 2047–48, 48 L.Ed.2d 597 (1976) (fourteenth amendment). The Title VI claim must fail as well since defendants disavow the receipt of any federal funds, Defendants' answer, ¶ 25, and plaintiffs have proffered no evidence to the contrary. *See Association Against Discrimination in Employment, Inc. v. City of Bridgeport,* 647 F.2d 256, 276 (2d Cir. 1981) ("for a claimant to recover under Title VI against an employer for discriminatory employment practices, a threshold requirement is that the employer be the recipient of federal funds aimed primarily at providing employment"),

*cert. denied,* 455 U.S. 988, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982).

Plaintiffs' complaint also raises violations of various provisions of state law, including article V, § 6 of the New York State Constitution; sections 52 and 61 of the Civil Service Law of the State of New York; Rules 3.6, 4.2, and 66.2 of the Rules and Regulations of the Department of Civil Service; and section 296.1(a) of the New York State Human Rights Law (N.Y. Exec.Law § 296.1(a) (McKinney 1982)). Because this Court concludes that defendants' actions have violated federal law and that the federal remedy will be a complete one, we need not reach the state law questions. *See Jong-Yul Lim v. International Institute of Metropolitan Detroit, Inc.,* 510 F.Supp. 722, 725 (E.D. Mich.1981) ("The limited grant of relief under Title VII is an indication of congressional intent to negate the exercise of pendent jurisdiction over the plaintiff's state law claims").

Cir.1983) (same); *Stotts v. Memphis Fire Department,* 679 F.2d 541, 555 (6th Cir. 1982) (Title VII consent decree "may produce more favorable results than more sweeping judicially imposed orders that might risk opposition and resistance.... Consent decrees also reduce the cost of litigation, engender judicial economy, and vindicate an important societal interest in affirmative action"), *cert. granted,* —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1331 (1983), defendants' actions were undertaken without proper attentiveness to settled Title VII law. *See Kirkland Lieutenants,* 711 F.2d at 1132 ("[s]imply stated, the remedies provided by a Title VII settlement, especially those containing race-conscious relief, must be substantially related to the objective of eliminating the alleged instance of discrimination ..., and must not unnecessarily trammel the interests of affected third parties"); *see also United Steelworkers of America v. Weber,* 443 U.S. 193, 208, 99 S.Ct. 2721, 2729, 61 L.Ed.2d 480 (1979); *Berkman v. City of New York,* 705 F.2d 584, 597 (2d Cir.1983) (district court should normally approve settlement "unless it contains provisions that are unreasonable, unlawful, or against public policy"); *United States v. City of Miami,* 664 F.2d 435, 441 (5th Cir.1981) (en banc) (plurality opinion) (voluntary Title VII compromise affecting third parties should be approved only if the court is satisfied that the effect on third parties is neither unreasonable nor proscribed); *Setser v. Novack Investment Co.,* 657 F.2d 962, 968 (8th Cir.1981) (en banc) ("The first burden on the employer in a reverse discrimination suit is to produce some evidence that its affirmative action program was a response to a conspicuous racial imbalance in its work force and is remedial. Some indication that the employer has identified a racial imbalance in its work force is necessary to ensure that new forms of invidious discrimination are not approved in the guise of remedial affirmative action ...."); *United States v. City of*

*Alexandria,* 614 F.2d 1358, 1366 (5th Cir. 1980).

Plaintiffs do not contend that prospective compliance with Title VII is not in fact a recognized defense to alleged Title VII violations. In *Kirkland Lieutenants,* the Second Circuit expressly noted that "[n]either Title VII nor the Constitution prohibits compromise agreements implementing race-conscious remedies which are agreed to prior to a judicial determination on the merits." 711 F.2d at 1130; *see also United Steelworkers of America v. Weber,* 443 U.S. 193, 207–08, 99 S.Ct. 2721, 2729, 61 L.Ed.2d 480 (1979); *Setser v. Novack Investment Co.,* 657 F.2d 962, 966–68 (8th Cir.1981) (en banc). *But see Teal v. Connecticut,* 645 F.2d 133, 139 (2d Cir.1981) ("Nor are we persuaded that construing Title VII to invalidate a selection process that includes an affirmative action component to insure nondisparate overall results will frustrate the general objective of achieving racial balance in the workforce. While Title VII may *permit* voluntary affirmative action in some instances, ... the statute was never intended to be interpreted as an affirmative action device. Indeed, § 703(j) of Title VII expressly provides that Title VII shall not be 'interpreted to *require* any employer ... to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist' in that respect in the employer's workforce" (emphasis by the court)), *aff'd,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982). The issue presently before this Court narrows, therefore, to a determination of the parameters of the prospective compliance defense.

### A. Adverse Impact

■ Relying on the Supreme Court decision in *Weber,* defendants take the position that their actions are insulated from Title VII liability since they only sought to prevent a discriminatory result and not to promote one.[10] *Weber* did in fact sanction affirma-

---

**10.** Specifically, defendants argue that rescoring the examination resulted in *no* adverse impact upon any race or ethnic group, Defendants' Memorandum in Support, p. 14, and only modest injury to non-minority candidates, Defendant-Intervenors' Memorandum in Opposition,

p. 8, since the 50% non-minority pass rate remained unaffected by the scoring adjustment. What defendants and defendant-intervenors fail to understand, however, is that *individual* non-minorities were indeed injured by the rescoring, despite the fact that the overall non-mi-

tive action aimed at eliminating a pattern of discrimination, as long as the method chosen did not unnecessarily trammel the interests of non-minorities. 443 U.S. at 208, 99 S.Ct. at 2729. Defendants also seek to justify their action by arguing that it was necessary in order to avoid an inevitable *Kirkland* -type suit by minority Correction Lieutenants.[11] In the language of Judge Wisdom of the Fifth Circuit, defendants obviously felt themselves in the unenviable position of being upon a "high tightrope without a net beneath them." *Weber v. Kaiser Aluminum & Chemical Corp.,* 563 F.2d 216, 230 (5th Cir.1977) (Wisdom, J., dissenting), *rev'd sub nom. United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). Despite the unfortunate Hobson's choice with which defendants perceived themselves confronted, this Court is unable to conclude other than that defendants' chosen action has unlawfully discriminated against these plaintiffs. This conclusion is reached on the basis of a number of serious flaws both in defendants' approach to the problem and in the underlying assumptions upon which they have proceeded.

The most fundamental problem with defendants' remedial action is to be found in the very premise upon which they proceeded, namely, an ostensibly conclusive finding of adverse impact. It is well established that when an affirmative action "settlement contains race-conscious relief affecting third parties, some well substantiated claim of racial discrimination against the plaintiff class is necessary 'to ensure that new forms of invidious discrimination are not approved in the guise of [race-conscious remedies].'" *Kirkland Lieutenants,* 711 F.2d at 1130 (quoting *Setser v. Novack Investment Co.,* 657 F.2d 962, 968 (8th Cir. 1981) (en banc)); *see also Fullilove v. Klutznick,* 448 U.S. 448, 497–98, 100 S.Ct. 2758,

2784, 65 L.Ed.2d 902 (1980) ("this Court has never approved race-conscious remedies absent judicial, administrative, or legislative findings of constitutional or statutory violations"); *Regents of the University of California v. Bakke,* 438 U.S. 265, 307, 98 S.Ct. 2733, 2757, 57 L.Ed.2d 750 (1978) (same); *Valentine v. Smith,* 654 F.2d 503, 508–09 (8th Cir.), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981); *Guardians Association of the New York City Police Department, Inc. v. Civil Service Commission,* 630 F.2d 79, 108 (2d Cir.1980), *cert. denied,* 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981); *Vulcan Society of the New York ·City Fire Department, Inc. v. City of New York,* 96 F.R.D. 626, 629 (S.D. N.Y.1983). Accordingly, this Court must consider on precisely what basis defendants founded their determination of adverse minority impact. The best summary of the factors taken into account is provided in the Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment:

> [T]he basis for the decision to use differential scoring was the adverse impact of the written test, the litigation history of examinations for Corrections supervisory security titles, the lack of any empirical data indicating that minority and non-minority candidates for Captain would not perform equally well on the job, and the availability of data regarding the job performance of minorities and non-minorities in the two supervisory titles directly below Correction Captain.

Defendants' Memorandum in Opposition, p. 5; *see also* Defendants' Memorandum of Law in Support of their Motion for Summary Judgment, pp. 3–11; Affidavit of John McKenna, ¶¶ 3–16. None of these factors, either individually or collectively, is suffi-

---

nority pass rate remained unchanged. *Cf. Connecticut v. Teal,* 457 U.S. 440, 452–56, 102 S.Ct. 2525, 2533–35, 73 L.Ed.2d 130 (1982) (no defense in Title VII action to employer who discriminated against individual minorities that minority class as a whole was represented in non-discriminatory proportions).

**11.** Consideration of this identical argument was expressly withheld by the *Weber* Court. 443 U.S. at 209 n. 9, 99 S.Ct. at 2730 n. 9. The Court did suggest, however, that "the freedom of any employer to undertake race-conscious affirmative action [does not] depend ... on whether or not his effort is motivated by fear of liability under Title VII." Id. at n. 8, 99 S.Ct. at n. 8.

cient to support a proper finding of adverse impact.

## The Test Itself

■ In terms of the examination results, defendants contend that the disparate impact on minority applicants was manifest after application of the four-fifths rule. A good deal of reliance is placed by defendants on the value of a statistical showing of adverse impact. It is of course true that a statistical showing of adverse impact creates a presumption of Title VII discrimination, *Kirkland Lieutenants*, 711 F.2d at 1130; *Guardians Association of the New York City Police Department, Inc. v. Civil Service Commission*, 630 F.2d 79, 88 (2d Cir.1980), *cert. denied*, 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981), and, in appropriate circumstances, may even serve to establish a prima facie case of employment discrimination. *See New York City Transit Authority v. Beazer*, 440 U.S. 568, 584, 99 S.Ct. 1355, 1365, 59 L.Ed.2d 587 (1979); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977); *Castaneda v. Partida*, 430 U.S. 482, 496 & n. 17, 97 S.Ct. 1272, 1281 & n. 17, 51 L.Ed.2d 498 (1977); *Kirkland Lieutenants*, 711 F.2d at 1130. Nonetheless, our consideration of defendants' statistics must proceed with caution, heeding the Supreme Court's admonition that "statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 340, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977); *see, e.g., Ingram v. Madison Square Garden Center, Inc.*, 709 F.2d 807, 810 (2d Cir.1983) ("Statistical evidence of discrimination based on but a few numbers is not, standing alone, compelling evidence of wrongdoing"); *Adams v. Reed*, 567 F.2d 1283, 1287 (5th Cir.1978) (too small a sample undercuts value of statistical evidence); *Morita v. Southern California Per-*manente Medical Group, 541 F.2d 217, 219–20 (9th Cir.1976) (same), *cert. denied*, 429 U.S. 1050, 97 S.Ct. 761, 50 L.Ed.2d 765 (1977); *Harper v. Trans World Airlines, Inc.*, 525 F.2d 409, 412 (8th Cir.1975) ("statistical evidence derived from an extremely small universe ... has little predictive value and must be disregarded"); Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.4[D] (1982) (with respect to four-fifths rule, "[g]reater differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant ...."). While this Court questions the statistical sufficiency of defendants' sample size, it is not prepared to hold that a pool consisting of thirty-two minorities and 240 or so non-minorities, is, as a matter of law, an inadequate number from which to draw statistical inferences.[12] Instead, the Court relies on the record presented, including the uncontroverted findings of plaintiffs' statistical expert, Dr. Michael Kavanagh, submitted in support of plaintiffs' motion for summary judgment. Dr. Kavanagh's report reads in part as follows:

> I also question the defendants' initial decision to adjust the raw scores on a racial/ethnic basis. In forming this opinion, I carefully examined: (1) the raw scores by racial/ethnic background, by seniority, and by type of previous experience; (2) the job descriptions for Correction Officer, Sergeant, Lieutenant and Captain as well as the job descriptions for the Narcotic Correction Officer Series; (3) two announcements for the competitive promotion examination for Correction Captain issued 11/1/74 and 12/18/81; and (4) copies of the Promotion Examination Application for all candidates who were placed on the eligible list resulting from Examination 37–526 including the blacks and Hispanics who failed Examination 37–526 but were given adjusted passing grades. I also examined the cur-

---

12. We do note, however, that prior litigation involving the Department of Corrections involved statistical findings of adverse impact based on much larger sample sizes. *See Kirk-*land Lieutenants, 711 F.2d at 1122 (739 candidates; 169 minority, 570 non-minority); *Kirkland Sergeants*, 374 F.Supp. at 1365 (1383 candidates; 1264 non-minority, 119 minority).

rent professional literature on personnel selection, with particular reference to racial/ethnic differences in employment testing and employment decisions. . . .

From the frequency distributions of scores on Examination 37–526, it is clear that the score distributions for minorities and non-minorities differ statistically. *It is premature and inconsistent with currently accepted professional standards and practices literature . . . to conclude, as the defendants have, that this was the result of the "disproportionate racial/ethnic impact of Examination 37–526."*

. . . .

The number of minorities on eligible list 37–526 is small. Those minorities whose only supervisory experience is ODAS experience constitute a substantial segment of the total list of minorities and as to that segment, I can state with reasonable professional certainty that it is more likely that the differences in the score distributions are a result of differences in prior experience rather than of racial/ethnic background differences. It is my opinion that under such circumstances, since Examination 37–526 is a professionally developed, job-related ability test which evaluated the merit and fitness of the candidates for the position of Correction Captain,[13] that there is insufficient foundation for concluding that the lower results for minorities was [sic] due to their racial/ethnic background and with the numbers and facts involved here, such a conclusion by defendants is not justified. Kavanagh affidavit, ¶¶ O, P, & T (emphasis added). Taking Dr. Kavanagh's findings as true, since defendants have failed to offer proof to the contrary, the statistics relied on

by defendants simply were not a sufficient basis upon which to predicate their determination of adverse impact requiring remedial measures.

### The Litigation History of Corrections Department Examinations

Defendants also claim to have relied on what they characterize as an empirically established pattern of discriminatory impact as evidenced through the course of prior Corrections Department litigation. Although the outcomes in both *Kirkland Sergeants* and *Kirkland Lieutenants* suggest the unfortunate fact that, at least in the past, DOCS' promotional procedures were not wholly free of any discriminatory impact, that fact alone does not, as defendants contend, impel the conclusion that the Captains exam similarly was tainted. However lamentable may have been defendants' promotional practices in the past,[14] it is not axiomatic that the present exam suffered equal infirmities, and defendants offer no basis for this Court to draw the same inferences that defendants have drawn from this past examination history. *Cf. Stewart v. CPC International, Inc.,* 679 F.2d 117, 121 (7th Cir.1982) ("At least one discriminatory act must have occurred within the charge-filing period. Discriminatory acts that occurred prior to this period constitute relevant evidence of a continuing practice, and may help to demonstrate the employer's discriminatory intent; and they will of course be used to determine the extent of the remedy that is in order. . . . But the prior discriminatory acts do not come into play at all unless the plaintiff can show in the first place that the discrimination is 'presently' continuing"); *Fisher v. Procter & Gamble Manufacturing Co.,* 613 F.2d 527,

---

**13.** To the extent Examination No. 37–526 is considered a professionally developed, job-related ability test, it is important to note that Title VII expressly recognizes such a test's use as a defense to any Title VII action. Specifically, § 2000e–2(h) provides:

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer . . . to give and to act upon the results of any professionally developed ability test provided that such test its administration or action

upon the results is not designed, intended or used to discriminate because of race . . . .

**14.** It is interesting at this point to note that the settlement agreement approved in *Kirkland Lieutenants* contains express disclaimers on the part of DOCS of any admission of unlawful discrimination, although DOCS did not dispute the facts showing adverse impact. *See* Stipulation of Settlement, art. I, ¶¶ 5 & 12. *But cf. Kirkland Lieutenants,* 711 F.2d at 1131 n. 16.

540 (5th Cir.1980) (same). This factor, too, provided an insufficient foundation for defendants' finding of discrimination.

### Data Regarding Job Performance

[6] The final factor relied upon by defendants in their decision to implement the scoring adjustment relates to their attempts to evaluate the job performance of minorities vis-a-vis non-minorities. Based on a variety of considerations, defendants felt comfortable in concluding that the disparities in test scores were in no way an indication of these minority candidates' inherent inabilities to perform in the same capacity as these non-minority applicants.[15] After reviewing the manner in which defendants arrived at this conclusion, and the uncontroverted evidence which has been proffered by plaintiffs, this Court is unpersuaded as to the validity of defendants' conclusions.

Essentially, defendants point to "the lack of any empirical data indicating that minority and non-minority candidates for Captain would not perform equally well on the job, and the availability of data regarding the job performance of minorities and non-minorities in the two supervisory titles directly below Correction Captain." Defendants' Memorandum in Opposition, p. 5. Significantly, the affidavit of John McKenna, Director of the Division of Examinations and Staffing Services, New York State Department of Civil Service, acknowledges that:

> No criterion measure for evaluating the job performance of minorities and non-minorities in the position of Correction Captain, as it exists in the Department of Correctional Services has been developed. It was not possible to develop such a measure, prior to administration of Examination No. 37–526, due to the small number of permanent incumbents (13) in the title. Even if a criterion measure were available, it would be impossible to apply, because too few appointments are made from an eligible list based on any one examination for Correction Captain to provide significant evidence of the relationship between job performance and test performance.

McKenna affidavit, ¶ 8. In the absence of actual data concerning Captain positions, defendants felt comfortable in relying on what best can be described as an intuition born of experience. In other words, defendants generalized from data and findings regarding other security titles with DOCS to the conclusion that these findings applied equally to the Captain positions. The affidavit of John McKenna continued:

> To the extent that data is available to the Department concerning the job performance of minorities and non-minorities serving in Corrections security titles, that data indicates that there are no statistically significant differences in job performance between the groups. It has also been this Department's experience that written tests for Corrections security titles have tended to result in adverse racial impact.

McKenna affidavit, ¶ 9.

In concluding that there is no significant difference between job performance by minorities and job performance by non-minorities, defendants essentially relied upon two sets of data—first, the results of a criterion-validation study performed for Correc-

---

**15.** The issue of job-relatedness is a crucial one in any Title VII inquiry. In the standard Title VII testing case, a defendant effectively may rebut a plaintiff's prima facie case of discrimination by proving that the test was "legitimately job-related." *Guardians Association of the New York City Police Department, Inc. v. Civil Service Commission,* 630 F.2d 79, 88 (2d Cir. 1980), *cert. denied,* 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981); *Kirkland Lieutenants,* 711 F.2d at 1130; *see Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In its simplest terms, job-relatedness here refers to whether or not the test accurately selected applicants who would be better Correction Captains. If that proved to be the case, then defendants' conclusions of adverse racial impact would not have required remedial action since job-relatedness would have provided a defense to a Title VII action brought by minorities. That is to say, if the Captains exam was in fact job-related, defendants' were not justified in engaging in any score adjustment since the adverse impact would have been rendered academic under a Title VII analysis.

tion Sergeants as part of the relief ordered by Judge Lasker in *Kirkland Sergeants,* and second, a random sampling of performance evaluations for candidates for the most recent Correction Lieutenant examination, both of which showed no statistically significant differences in job performance between minority and non-minority candidates. Defendants' Memorandum in Support of their Motion for Summary Judgment, p. 10; McKenna affidavit, ¶¶ 10 & 11. For the reasons which follow, defendants' reliance on these data was misplaced.

With respect to the criterion validation study, defendants point to *Kirkland Sergeants* and the study results which indicated that minorities characteristically performed less well on the final selection procedures than non-minorities, but that this difference was not reflected in differences in job performance. *See Kirkland Sergeants,* 482 F.Supp. 1179 (S.D.N.Y.), *aff'd,* 628 F.2d 796 (2d Cir.1980), *cert. denied,* 450 U.S. 980, 101 S.Ct. 1515, 67 L.Ed.2d 815 (1981). With respect to the random sampling of performance evaluations for candidates for the Lieutenants exam, defendants discerned a similar pattern. Once again, the uncontroverted report of plaintiffs' expert, Dr. Michael Kavanagh, proves determinative here. The conclusions of Dr. Kavanagh are excerpted at length:

> The most obvious error made by the defendants in their analysis performed to justify adjusting the test scores of minorities and non-minorities is the use of the criterion-validation study completed for the Correction Sergeant Examination and the study that reviewed the performance ratings of forty-one individuals who took and passed the examination for Correction Lieutenants.
>
> As an initial matter, the results obtained from studies done on Sergeants or Lieutenants cannot be used to justify decisions on a test for Correction Captains. Although these jobs are all in a promotional series, they are different jobs, as the job descriptions reveal. Both the Uniform EEOC Guidelines on Employee Selection Procedures and The Principles for the Validation and Use of Personnel Selection Procedures state clearly that representativeness of the sample is critical for justifying criterion-validation for a selection test. After my examination of the job descriptions for Correction Sergeant, Correction Lieutenant, and Correction Captain, I have concluded, with reasonable professional certainty, that there are important differences between these positions and that generalizing results from studies done on the different jobs of Correction Sergeants and Lieutenants does not provide a valid foundation to justify the adjustment of scores on an examination for Correction Captains. Clearly, a criterion-validation study using Correction Captains as the appropriate sample would need to be done prior to adjusting test scores on Examination 37–526, and the method used by the State is not acceptable in light of professional guidelines and standards. There are also fatal technical deficiencies in the other study used by the State.
>
> My review of the study of the performance ratings of forty-one Correction Lieutenants who passed Lieutenants Examination 36–808 reveals serious and disqualifying defects. First, according to the data from this study, there were only forty (not forty-one) individuals who were rated, eleven minorities and twenty nine non-minorities. This is much too small a sample from which to draw any statistical inferences regarding the differences in job performance ratings of minorities and non-minorities who had passed the qualifying examination for Correction Lieutenant. Furthermore, there are multiple data points (multiple performance ratings) for some individuals in this study and single performance ratings for others. This lack of independence of data points and inconsistency of observations of individuals in the study makes [sic] any statistical analyses of this data unreliable and speculative. I can state with reasonable professional certainty that the random sampling that had been done of the performance ratings of Correction Lieutenants which the defendants claim "showed there was no difference in performance between minorities

**1574**

and non-minorities," is so inadequate and so technically deficient and speculative that no reliable statistical conclusions can be drawn therefrom and that statistical conclusions drawn therefrom by the State are not valid.[16]

Kavanagh affidavit, ¶¶ C–E.

On the basis of the foregoing, it is clear to this Court that defendants' conclusions of adverse impact were fundamentally unfounded. Because defendants acknowledge the bases upon which their finding of adverse impact was predicated, and have indicated that the calculus employed in reaching that determination was the sole means available, summary judgment here seems particularly appropriate. There is simply no disputed issue of material fact concerning what this Court holds to be an unsupported finding of adverse impact. Defendants' evidence fails to establish the existence of any material fact with respect to their finding of adverse impact.

### B. Failure to Consider Rebuttal of the Prima Facie Case

■ Assuming, *arguendo*, defendants were confronted with a legitimate showing of adverse impact, a more serious problem is

---

**16.** The Kavanagh affidavit points to an additional reason which explains away any inference of actionable adverse racial impact. Based on the affidavit, plaintiffs claim the reason for the disparate performance of minorities vis-a-vis non-minorities relates to the experience the minority candidates brought with them to the examination. Apparently, a number of minority candidates qualified to take the Captains exam on the basis of their supervisory experience within the Office of Drug Abuse Services ("ODAS"), in contrast to most plaintiffs, whose qualifying experience was in the form of Corrections Department service. In evaluating this factor, Dr. Kavanagh noted:

> Based on my careful examination of the job descriptions for Corrections Officers, Correction Sergeants, Correction Lieutenants and Correction Captains, it is apparent to me that these positions form a separate career path. The emphasis in the Corrections path is insuring that security is maintained for convicted felons . . . .
> The Narcotic Correction Officer Series also forms a separate sequential career path. In contrast to the corrections career path, the ODAS career path emphasis is on "treatment" and not security . . . .
> Based on my examination of these job descriptions, it is apparent to me that the two separate career paths result in significantly different job experiences, in light of which one would expect that those candidates whose sole qualifying supervisory experience was with ODAS would not do as well on a Correction series promotion test as those with the typical correction career progression. My examination indicates that this is born [sic] out and that a large number of candidates whose sole qualifying supervisory experience is in ODAS are black or Hispanic.

Kavanagh affidavit, ¶¶ Q–S.

On the basis of what plaintiffs allege to be the limited data provided by defendants, it appears that at least six of eleven candidates with ODAS experience only were black or Hispanic. Defendants' response is essentially twofold.

First, defendants suggest that such an argument is irrelevant as a matter of law, since the reasons for adverse impact do not affect the question of whether a prima facie case of discrimination has been established. While it is true that in constructing a prima facie case, the reasons for adverse impact are indeed irrelevant, *see Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–36, 91 S.Ct. 849, 854–56, 28 L.Ed.2d 158 (1971), defendants neglect to take account of the importance such reasons have in *rebutting* the prima facie case. *Kirkland Lieutenants,* 711 F.2d at 1132 (lack of experience may be relevant to question of a test's job-validity). To the extent the prima facie case may be rebutted by such a showing, the underlying explanation for disparate impact assumes great importance.

Next, defendants argue that plaintiffs' argument is factually incorrect, and suggest that prior case law has established that differences in responsibility between ODAS supervisory officers and supervisory corrections officers are negligible. Defendants cite *Stokes v. New York State Department of Correctional Services,* 569 F.Supp. 918 (S.D.N.Y.1982), and *Kirkland Lieutenants,* 711 F.2d at 1132 which cites *Stokes* with approval. While *Stokes* did indeed find only negligible differences in the responsibilities and performance capabilities between some ODAS and DOCS personnel, defendants' reading of that opinion is too broad when applied outside the factual context of that case. Significantly, *Stokes* dealt only with the comparable performance of Correction Officers, Sergeants, and Lieutenants. There was no finding that ODAS Officers were suited to jobs as Correction Captains. It well may be that the lower echelon positions within DOCS and ODAS are entirely interchangeable with no noticeable diminution of performance. It does not, however, necessarily follow that the ODAS experience truly "qualified" or prepared ODAS Officers for the Captain's examination. *See* Kavanagh affidavit, ¶¶ Q–T.

presented by the manner in which they proceeded to treat that showing. In short, contrary to settled Title VII law, defendants arbitrarily and unilaterally transformed what they perceived to be a prima facie showing of a Title VII violation into a *conclusive* finding of illegal discrimination, without properly considering or permitting the possibility of, or opportunity for, rebuttal. *Cf. Furnco Construction Corp. v. Waters,* 438 U.S. 567, 576, 578–80, 98 S.Ct. 2943, 2950–51, 57 L.Ed.2d 957 (1978) ("We think the Court of Appeals went awry, however, in apparently equating a prima facie showing under McDonnell Douglas with an ultimate finding of fact as to discriminatory refusal to hire under Title VII; the two are quite different. . . . A McDonnell Douglas prima facie showing is not the equivalent of a factual finding of discrimination. . . . Rather, it is simply proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations . . . .").

Defendants place a good deal of reliance on the recent decision in *Kirkland Lieutenants,* and steadfastly adhere to the view that the holding in that case wholly vindicates, indeed, compels, the remedial measures which were instituted here. This Court concludes, however, that defendants' attempt to enlarge the *Kirkland Lieutenants* holding to fit the facts presented here represents an unreasonable and omissive reading of that opinion.

Initially, it is important to note that *Kirkland Lieutenants* involved approval of a settlement agreement which had been entered into after arms length bargaining between the parties. The primary holding of the Second Circuit was that such a settlement properly might be approved solely upon a finding that a prima facie case of discrimination had been established. The court rejected the argument that there also must be a judicial determination that the challenged examination was not job-related. 711 F.2d at 1129–30. Specifically, the court noted:

[B]ecause a judicial finding of unlawful discrimination under Title VII allowing the imposition of race-conscious remedies can be made on the showing of a *prima facie* case *when the defendant fails to rebut the case,* we think that an unrebutted *prima facie* case is sufficient to serve as a proper basis for a settlement containing race-conscious remedies when the defendant chooses to enter into a compromise.

711 F.2d at 1131 (emphasis added). That holding, however, is not dispositive of the issue here. First, it is clear that the present case does not involve any type of settlement agreement with the attendant bargaining between the parties. Second, and more importantly, *Kirkland Lieutenants* did not, as defendants would have this Court believe, eliminate the defensive option of rebutting the prima facie case. Rather, the opinion held only that an unrebutted prima facie case was a sufficient predicate for a voluntary compromise. Presumably, were the defendants in *Kirkland Lieutenants* able to rebut the prima facie case they faced, there ultimately would have been no liability on their part. The compromise was no doubt prompted by the fact that defendants there felt themselves unable properly to rebut the prima facie case. The present situation is wholly different.

Here, plaintiffs never were afforded the chance to rebut the prima facie case these defendants perceived they faced in the context of an inevitable *Kirkland*-type suit. Concomitantly, defendants too would have the opportunity to rebut the prima facie case in the *Kirkland*-type action which they envision as flowing inexorably from a decision not to adjust test scores. Instead, however, defendants neglected to address adequately the rebuttal possibilities, and failed to consider the likelihood of their success. In other words, defendants, in enacting race-conscious remedies, acted only on the basis of what they perceived to be a prima facie case and gave inadequate consideration to the possibility that such a prima facie case could have been rebutted. Plaintiffs here have demonstrated that re-

buttal was indeed likely. Because defendants acted without taking into account the full learning of Title VII law, their decision to effect race-conscious relief was improvidently made. Voluntary compliance with Title VII cannot be approved where the decision to effect perceived compliance with Title VII is arrived at without considering rebuttal explanations of job-relatedness for discriminatory impact.

The holding here is well in accord with that in *Kirkland Lieutenants*. It is not suggested that a judicial determination of non-job-relatedness must sanctify any particular compliance plan. Outside the scope of settlement agreements, however, a prerequisite to implementation of race-conscious remedies is establishment of a prima facie case of discrimination *and* thorough consideration of whether that case effectively may be rebutted. To proceed with remedial relief without properly having evaluated the possibility of rebuttal would be to ignore the clear and established mandate of Title VII law. When non-judicial entities seek to affect the legal rights of aggrieved parties, it is only proper that the basis for any such action conforms to the standards that would govern any similar judicial resolution. To allow defendants here to advance a Title VII framework wholly of their own design would work substantial injury upon the carefully developed history of Title VII protection.

Defendants have acknowledged that, in the main, they did not, indeed, could not, properly consider job relatedness after determining the presence of adverse impact. *See* McKenna affidavit, ¶¶ 8–11, 14, 17, & 19. Because there is no factual issue as to whether rebuttal evidence properly was considered, summary judgment here is warranted.

### C. Methodological Problems

■ Defendants' resolution of what was perceived to be the discriminatory problems with Examination No. 37–526, suffers from one final infirmity. Even assuming the propriety of the need for defendants' actions in remedying the alleged discriminatory impact of DOCS' promotional procedures, the method by which defendants chose to effect their remedy was itself fundamentally flawed.

The problem with defendants' approach may be viewed on at least two levels. Initially, consideration is directed to the scope of defendants' proposed cure. The statistics which led defendants to a finding of adverse impact consisted of an examination pass rate of approximately fifty percent for non-minorities and approximately twenty-five percent for minorities. More specifically, of thirty-two minorities, only eight succeeded in passing the exam. Of the thirty-two minorities, twenty-eight were black and four were Hispanic. Of the four Hispanics, two passed the exam and two failed, a pass rate of fifty percent. Admittedly, the sample pool of Hispanics is too small to allow any statistically meaningful inferences. Nonetheless, in adjusting minority scores, Hispanics unnecessarily were included in the group whose scores were inflated artificially by defendants' process. Clearly, there was no justification for making any change in Hispanic candidates' test scores; there was simply no statistical evidence of discriminatory impact on this group of candidates. In increasing the scores of these candidates without justification in the form of adverse impact findings, defendants' actions were improper. *See Kirkland Lieutenants*, 711 F.2d at 1130 ("When the settlement contains race-conscious relief affecting third parties, some well substantiated claim of racial discrimination against the plaintiff class is necessary 'to ensure that new forms of invidious discrimination are not approved in the guise of [race-conscious remedies]'") (quoting *Setser v. Novack Investment Co.*, 657 F.2d 962, 968 (8th Cir.1981) (en banc)). "Simply stated, the remedies provided by a Title VII settlement, especially those containing race-conscious relief, must be substantially related to the objective of eliminating the alleged instance of discrimination ....". *Kirkland Lieutenants*, 711 F.2d at 1132; *see also Stotts v. Memphis Fire Department*, 679 F.2d 541, 553 (6th Cir.1982), *cert. granted*, —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1331 (1983); *Setser v. Novack Investment Co.*, 657 F.2d 962, 968 (8th Cir.

1981) (en banc) ("The second burden on the employer in a reverse discrimination suit is to produce some evidence that its affirmative action plan is reasonably related to the plan's remedial purpose. The goals and timetables for the program should be reasonably related to such considerations as the racial imbalance of the work force, the availability of qualified applicants, and the number of employment opportunities available . . . ." (footnote omitted)); *Valentine v. Smith,* 654 F.2d 503, 510 (8th Cir.), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981); *Detroit Police Officers' Association v. Young,* 608 F.2d 671, 696 (6th Cir.1979), *cert. denied,* 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981).

An even more critical flaw may be found in defendants' overall statistical methodology. Again, reference must be made to the uncontroverted affidavit of plaintiffs' statistical expert, Dr. Michael Kavanagh, and again, extensive quotation is warranted:

> In terms of professionally accepted standards for the treatment of test scores, the second set of deficiencies with the defendants' methodology involves the procedures used by the defendants to normalize and standardize the raw test scores in order to combine the non-minorities and minorities into one final rank ordering. . . .
>
> Bearing in mind that the underlying assumptions made by the State for normalizing and standardizing the minority raw score distribution as discussed in paragraphs C through F are themselves defective thereby rendering the process invalid, there is a further defect inherent in the State [sic] calculations. This additional defect is at least as serious as the error in the State's underlying assumption and the combining of the two defects magnifies the error.
>
> The first problem involving the normalization and standardization procedures used by the defendants is the violation of two basic statistical prerequisites necessary to justify standardization and normalization. These two prerequisites are: (1) the distribution of raw scores approximates the normal distribution; and (2) the number of test candidates must be sufficiently large (at least 100 per Nunnally, 1975). Although the total number of candidates changes across the calculation worksheets provided by the defendants, it appears there are either 33 or 34 minorities and 243, 245, or 251 non-minorities. The number of minorities is simply not large enough to provide a valid statistical base for standardization and normalization. Examination of the score distributions separately for minorities and non-minorities indicates that the score distribution for non-minorities approximates the normal distribution, but in contrast, the score distribution for minorities does not approximate the normal distribution. Thus neither prerequisite has been fulfilled with the result that the approximation and estimation procedures used by the State in the normalization and standardization process are inadequate and without proper foundation, resulting in increased error attached to the adjusted minority scores. This fact destroys the validity of the *adjusted* scores for selection purposes.
>
> To explain in layman's [sic] terms, a normal distribution of scores achieved by a sufficient number of test takers when placed on a graph plotting the number of candidates achieving each score will result in a so-called "bell curve" which is created because most of the candidates receive marks in the middle range of scores while there are relatively few candidates who receive the highest scores or the lowest scores. Such a bell curve is what is known as a normal distribution. I emphasize at this point that plotting the results of all of the test candidates, both minority and non-minority, results in a typical bell curve. Although the State's figures seem to differ between documents, it is clear that there were over 270 total candidates. I have plotted the scores, and upon plotting the scores of the non-minority candidates, a total of approximately 240 candidates, depending on which of the State's figures one uses, the result is a typical bell curve. By contrast, when the scores of the 34 minority candidates are plotted on a graph, the

line resulting is relatively flat, it is not a bell curve and prohibits standardizing scores based on the· normal curve. The fact that there are only 34 minority candidates, not the minimum 100 needed to *allow* normalization recommended by accepted experts in the testing field (Nunnally, 1965), exacerbates an already incorrect methodology. It strains and violates every professional principle of test scoring, particularly normalization procedures, to suggest that you can adjust a non-normal curve of minority scores and then combine those scores with a normal sample of non-minority scores, and then assert that you have normalized and standardized the two score distributions. This is simply not normalizing and standardizing but rather a distortion of the terms, a violation of all current professional standards, practices and research findings.

In technical terms, the fatal defect is created when the standardization is done within distributions, i.e., within the minority distribution and separately within the non-minority distribution, and then these separate, *within distribution* adjusted final scores are combined across distributions to derive ranks for an eligibility list. The amount and direction of an adjustment to a raw score is dependent on the characteristics of its score distribution, i.e., the mean and variance of the raw score distribution. Since the mean and variances of the raw score distribution for minorities and non-minorities differ, the within distribution adjustments to the raw scores differ for minorities and non-minorities. Combining these two sets of adjusted scores as if they were based on the same within distribution adjustments is a violation of basic professionally accepted practices and standards of testing. The comparison between ranks of *this* combined distribution of adjusted final scores is simply illegitimate.

Kavanagh affidavit, ¶¶ F–J (emphasis in original).

The conclusions of Dr. Kavanagh take on particular significance when viewed in light of Title VII case law. The courts consist-

ently have enunciated that if an employer uses an alternative selection device to minimize the adverse impact of its present selection procedure, that alternative must be at least as valid as the device which it replaces. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973); *Guardians Association of the New York City Police Department, Inc. v. Civil Service Commission,* 630 F.2d 79, 110 (2d Cir.1980), *cert. denied,* 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981); *see also* Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.3[B] (1982) ("Where two or more selection procedures are available which serve the user's legitimate interest in efficient and trustworthy workmanship, and which are substantially equally valid for a given purpose, the user should use the procedure which has been demonstrated to have the lesser adverse impact"). Despite the fact that defendants' separate frequency distribution apparently has resulted in making more minority candidates eligible for promotion to Captain, defendants have come forward with no evidence controverting plaintiffs' claim that this new method is not as effective as the one it replaced. Absent such proof, this Court is unable to conclude other than that defendants illegally have discriminated against plaintiffs.

Defendants do argue strenuously for the legitimacy of separate frequency distribution as established in the course of the *Kirkland Lieutenants* litigation. Again, defendants seek too broad a reading of that case. The affidavit of John McKenna states that the separate frequency distribution was approved as a valid technique by the *Kirkland Lieutenants* court. More accurately, that court only approved a stipulation of settlement containing the following language:

In the event that a written examination is used as part of one or both of the new selection procedures, defendants shall consider application of one or more of the following techniques to minimize or elimi-

nate adverse impact on minority candidates should such adverse impact result:

i. Separate frequency distributions for minority and non-minority candidates

. . . .

Stipulation of Settlement, art. VI, ¶ 7(d). There is certainly no approval by the court of the use of such a technique in circumstances where it would not be appropriate, nor where there exists no proper foundation for its use. Indeed, the technique is merely a suggested one and is by no means mandated by the *Kirkland* court. To the extent defendants improperly have applied the technique, this Court cannot approve its use here.[17]

### D. Certain Plaintiffs' Standing to Sue

Defendants raise objections to the standing of certain plaintiffs to maintain the present suit. Specifically, defendants focus on three categories of plaintiffs. First, defendants contend that some named plaintiffs failed the examination and so, were not affected by the scoring adjustments since even without the adjustments they would not have been eligible for promotion. Second, defendants point to plaintiffs whose examination scores were so high that their promotions would be assured despite a shuffling of the rank order on the eligible list. Finally, defendants argue that one plaintiff's score, while passing, was so low that it ranked him near the bottom of the eligible list and therefore would serve to preclude his promotion.

■ Standing, of course, requires that a plaintiff allege " 'such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975) (emphasis in original) (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). The plaintiff must suffer a concrete, personal injury as a result of the acts

---

17. This conclusion is further supported by the affidavit of Dr. Kavanagh:

> The Uniform Guidelines on Employee Selection Procedures ("Uniform Guidelines"), the official publication of the Equal Employment Opportunity Commission concerning testing standards, suggest that if an equally valid selection procedure is available, that alternate selection procedures [sic] may be considered under certain circumstances. It is essential, of course, that the alternate selection procedure must itself be valid. This concept of choosing between two separate but equally valid selection devices is known generally as the concept of alternative selection devices. Even under the Uniform Guidelines, before an alternate selection device should be considered, that device must be at least as valid and at least as job related as the device it replaced. (See Uniform Guidelines, 29 CRF 1607) [sic].
>
> . . . .
>
> Since Examination 37–526 is a professionally developed, job-related ability test which measured the merit and fitness of the candidates for the position of Correction Captain, the raw scores obtained by the candidates on the test are an accurate measure of the merit and fitness of the candidates to perform the job of Correction Captain. That is, the total score distribution (unadjusted), regardless of racial/ethnic background, represents important individual differences in the candidates' merit and fitness to perform the job of Correction Captain. Under such circumstances, by definition, any adjustments to the raw scores that result in differentially changing the scores dependent on the racial/ethnic background of individuals, and the rank ordering of individuals within the total score distributions introduces error into the candidates' scores. As has been discussed earlier, the normalization and standardization procedures used by the defendants did introduce differential adjustments based on racial/ethnic background, and the adjustments to the minority scores were poor approximations of true scores. Thus, by definition, and consistent with accepted testing methods and theory (Guilford, 1956; Nunnally, 1975; 1978), the score distribution adjusted by separate frequency distributions for minorities and non-minorities must be less valid and less job related than the original raw score distribution from Examination 37–526.
>
> Based on these factors, it is my professional opinion based on my education, background, training and experience, that the substitution of the selection device utilized by the State, which in my view is not a valid selection device, for a valid selection device violates the Uniform Guidelines and The Principles For the Validation and Use of Personal [sic] Selection Procedures as well as the currently accepted professional standards, practices and research findings, and such a substitution under the circumstances here is not a correct selection procedure.

Kavanagh affidavit, ¶¶ K–N.

which he challenges. 422 U.S. at 508, 95 S.Ct. at 2210.

■ It is clear that the two plaintiffs (Donald E. Clark and Gerald Sweeney) who failed examination No. 37–526 lack standing to challenge defendants' actions. No rights of these plaintiffs were affected by a re-scoring of the exam since their names would not have been placed on the eligible list even without the challenged scoring adjustment. Accordingly, these two plaintiffs are not proper parties to this suit and must be dismissed. As to all other plaintiffs, however, this Court cannot conclude that they have not alleged a "personal stake in the outcome of the controversy." Notwithstanding the fact that some plaintiffs would be promoted despite a shuffling of the ranks on the eligible list, the *timing* of these plaintiffs' promotions provides the concrete interest necessary for standing. Since promotions are made in a descending order off the eligible list, N.Y.Civ.Serv.Law § 61.1 (McKinney 1983), each position on that list affords its holder a right to the first available promotion corresponding to the point on the list from which the next promotable candidate will be drawn. Since there has been some shuffling of rank caused by the rescoring, these plaintiffs necessarily will have their promotions subordinated in time to those minorities who have advanced on the list.

■ As to those plaintiffs whose ranks relegate them to the lower end of the eligible list, it cannot be said as a matter of law that they would not suffer from the rescoring. While their low rankings make promotion appear unlikely, it is not at all certain that no promotion remains possible. Since, theoretically, all persons on the eligible list remain eligible for promotion, and because rank order on that list is all important, any re-ranking effect engendered by defendants' actions confers standing upon these plaintiffs.

### E. Relief

■ Plaintiffs seek, and are entitled to, declaratory and injunctive relief against the use of Examination No. 37–526's adjusted scores and the eligible list which was promulgated pursuant to them, as a basis for appointments to the position of Correction Captain. Accordingly, the scoring adjustment to Examination No. 37–526 is declared to be in violation of Title VII and defendants are enjoined from making appointments based on the adjusted results.

### Monetary Relief

Plaintiffs additionally seek an award of "monetary damages for any and all financial loss which they may have sustained by reason of the delay and deprivation of promotion and damages to their reputations caused by defendants' unlawful acts." Complaint, ¶ VII(F).

■ Title VII expressly provides for awards of back pay.[18] 42 U.S.C. § 2000e–5(g). Indeed, a finding of a violation of Title VII presumptively entitles a plaintiff to back pay and retroactive promotion or reinstatement. *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).[19] However, a back pay award remains within the discretion of the court and is available only where "the court finds that the respondent has intentionally engaged in ... an unlawful employment practice ...." 42 U.S.C. § 2000e–5(g); *see also Guardians Association v. Civil Service Commission,* —— U.S. ——, ——, 103 S.Ct. 3221, 3235, 77 L.Ed.2d 866 (1983) ("a private plaintiff should recover only injunctive, non compensatory relief for a defendant's unintentional violations of Title VI"). While it is clear that defendants' actions resulted in discrimination against these plaintiffs, this Court is persuaded that defendants' intentions were only to comply with Title VII and did not manifest any deliberate at-

---

**18.** The eleventh amendment does *not* bar back pay awards against the states because Title VII was enacted pursuant to Congress' authority under the enforcement powers conferred by § 5 of the fourteenth amendment. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456–57, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976).

**19.** Of course, a Title VII defendant may rebut this presumption of entitlement by proving by clear and convincing evidence that the plaintiff would not have been hired or promoted *even if* there had been no discrimination. *Day v. Mathews,* 530 F.2d 1083, 1085 (D.C.Cir.1976).

tempt to discriminate against these plaintiffs. Accordingly, the request for compensatory relief in the form of back pay is hereby denied.[20]

### Costs and Attorneys' Fees

■ Title VII expressly provides:

In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs . . . .

42 U.S.C. § 2000e–5(k). Plaintiffs are hereby awarded costs, including reasonable attorneys' fees, in an amount to be determined after further documentation by the parties. Accordingly, the parties are directed to submit the affidavits necessary for a proper fee determination. *See New York State Association for Retarded Children v. Carey,* 711 F.2d 1136 (2d Cir.1983).

### V

On the basis of the foregoing, it is clear that defendants have failed to come forward with sufficient evidence of disputed factual issues to preclude this Court from granting plaintiffs' motion. Defendants' actions, taken as they were without due regard for the carefully defined standards of Title VII law, are without proper legal support or justification. Since defendants do not contest, indeed, admit, the factual issues which informed their decision to act as they did, this Court's finding that, in light of plaintiff's proffer of proof that that determination was erroneous, compels summary judgment in plaintiffs' favor. Accordingly, plaintiffs' motion for summary judgment pursuant to Fed.R.Civ.P. 56(a) is granted. Defendants' and defendant-intervenors' motions for summary judgment are hereby denied.

It is so Ordered.

20. That part of the request for relief which may be construed as seeking compensatory relief other than back pay, is similarly denied. *See, e.g., Hayden v. Atlanta Newspapers,* 534 F.Supp. 1166, 1168 (N.D.Ga.1982); *Curran v.*

*Portland Superintending School Committee,* 435 F.Supp. 1063, 1078 (D.Me.1977); *Whitney v. Greater New York Corporation of Seventh-Day Adventists,* 401 F.Supp. 1363, 1368–70 (S.D.N.Y.1975).